# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00507-CR

**Ramon Arebalo, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT NO. 9034009, HONORABLE BOB PERKINS, JUDGE PRESIDING

## O P I N I O N

Ramon Arebalo was convicted by a jury of aggravated assault with a deadly weapon and sentenced by the court to thirty years' imprisonment. In one issue, he contends that the trial court erred in permitting the State to elicit the details of his prior felony convictions in its cross-examination of him and that such error requires reversal. Because we hold that the trial court erred in admitting the details of Arebalo's prior convictions but that such error was harmless, we affirm the judgment of conviction.

## BACKGROUND

On August 7, 2002, Arebalo accompanied Donna Wood to her hotel room shortly after meeting her for the first time. Arebalo testified that before he agreed to go with her to the room, Wood offered to perform sexual acts with him for fifty dollars. Wood testified that they had

discussed her performing sex for money but had not agreed on a price yet.  On the way to Wood's hotel, Wood stopped to call friends who were in her hotel room and asked them to vacate it to give her some privacy.  Arebalo testified that he was nervous about going to Wood's hotel room after this phone call but that he nevertheless proceeded voluntarily.  After Wood and Arebalo entered the hotel room, Wood walked towards the restroom.  According to Wood's testimony, she used the restroom and then approached Arebalo, who then "went ballistic" and attacked her.  She could not remember any of the details of the attack, probably due to the head injuries she suffered.  The next thing she remembered was her boyfriend calling 911.  Arebalo testified that Wood merely turned the light on in the restroom and then immediately approached him, touched and kissed him, then shoved him back, demanded money, and told him he could not leave the room.[1]  Arebalo testified that Wood then stood in front of the closed door to the room, preventing his escape.  Arebalo testified that he punched Wood twice in the face—first with his right fist on the left side of her face, and then with his open left hand in her teeth, after she had fallen to the floor, gotten up, and regained her balance. He testified that he did so in self-defense, that he feared she, and perhaps some of her friends who may have been waiting outside, would rob him and that she would not allow him to leave the room without giving up his money.

Wood suffered extensive injuries to her head:  a broken jaw, shattered facial bones, brain swelling, bruises, swollen eyes and lips, stitches, and also some bruising on her back.  Officer Brandon Sheffy testified that Wood's injuries were unlikely the result of only one or two punches. Officer Atilano Guerra testified that Wood's injuries were the worst he had seen in his career.  The

---

[1] Arebalo and his counsel conjectured that Wood's turning on the bathroom light may have been a "signal" to her supposed accomplices waiting outside to help in the alleged robbery.

officers also testified that, in their experience, hands and fists can be deadly weapons. Wood testified that after the assault her mouth was wired shut for six weeks and that she was unable to care for herself during that time. On cross-examination, Arebalo admitted that he caused serious bodily injury to Wood.

Just prior to the incident, two acquaintances of Wood's boyfriend were sitting outside the hotel in an SUV, picking up the woman whom Wood had asked to leave her room. These three acquaintances remained sitting in the vehicle long enough to witness Arebalo and Wood enter the room together and Arebalo leave the room alone about five minutes later. One acquaintance testified that Arebalo looked suspicious: he looked around after leaving the room and then ran away. She and the other woman in the SUV thought this behavior was odd, coupled with the short time that Arebalo was in the room; they decided to call the room to check on Wood.

After receiving no answer on the phone, one of the women went and knocked on the door. After receiving no answer, she went to fetch Wood's boyfriend from the swimming pool. Wood's boyfriend and the acquaintance went inside the room, found Wood badly beaten, and called 911. After calls had been placed for emergency services, the driver of the SUV and the two women acquaintances got back into the vehicle and drove in the direction they had seen Arebalo run; they soon caught sight of him. The driver was talking on his cell phone to the police as the SUV followed Arebalo, detailing Arebalo's movements. At one point the SUV pulled up alongside Arebalo, and there was some exchange between him and the passengers. One of the acquaintances testified that the driver yelled, "What's up?" and that Arebalo approached the vehicle but then ran away after the driver yelled that they knew what he had done.

3

On direct examination, Arebalo testified that he was afraid one of the passengers in the SUV was going to shoot him when he saw her reach down to get something out of her purse. He was then asked, "Have you ever been shot before?" He replied, "no." His counsel next asked, "Have you ever seen somebody get shot?" Arebalo replied, "Yes, sir." His counsel proceeded to question Arebalo about the events of that evening.

On cross-examination, the State started questioning Arebalo about his prior convictions, which Arebalo had earlier admitted on direct examination. He had been convicted first for aggravated assault with a deadly weapon and second for possessing a deadly weapon in a penal institution. The State asked him if the first conviction was a plea bargain, and defense counsel objected that the details of prior convictions are not admissible. *See Mays v. State*, 726 S.W.2d 937, 953 (Tex. Crim. App. 1986). The trial court allowed the State to continue its questioning. The State elicited from Arebalo that the deadly weapon in the first case was a pistol. The defense made a running objection to the line of questioning. The State continued,

Q. In fact, didn't you shoot a fellow with that pistol?

A: Yes, sir.

Q. Because on direct examination you said you had seen somebody shot with a firearm before, right, and is the instance you were talking about?

A: Yes, sir.

Q. And you shot this guy?

A. Yes, sir.

Q. Was he trying to rob you, too?

4

A. He pulled a pistol out on me. He shot my truck first.

Q. Self-defense, right?

A. Yes, sir.

Q. Okay. You went to prison for that, though, right?

A. Yes, sir.

Q. Self-defense didn't work, did it?

A. It did work.

Q. You went to prison for seven years?

A. They offered me more.

Q. Oh, a plea bargain, but you pled guilty to it?

A. I didn't have no choice. I was guilty of the crime.

Q. So now you are in prison, and would you agree with me that aggravated assault is a violent offense, shooting somebody with a pistol? [ . . . ]

A. Yes.

[ . . . ]

Q. . . . So while you were in prison, you were convicted of a deadly weapon in a penal institution?

A. Yes, sir.

Q. You like weapons, don't you?

A. Only when I got to defend myself, sir.

Q. Everybody is always attacking you, aren't they?

A. (Moving head up and down).

5

The comment on direct examination to which the State referred was in the context of Arebalo's testimony about being frightened by the woman in the SUV reaching for her purse. In argument to the trial court, the State urged that Arebalo had opened the door to its line of questioning by leaving a false impression with the jury about the person he had seen get shot. The State sought to clarify that it was *Arebalo* who had done the shooting. The court overruled Arebalo's objection. The jury convicted Arebalo of aggravated assault and found that he used or exhibited a deadly weapon, namely his hands and fists.

## DISCUSSION

Arebalo asserts that the trial court improperly permitted the State to elicit details concerning his prior convictions. He argues that it unfairly prejudiced him by implying that he had a violent character and thus undermined his theory of self-defense. Although the fact that a witness has been previously convicted of a crime may be introduced into evidence for the purpose of impeachment, the details of that offense are inadmissible. *Id.*; *Murphy v. State*, 587 S.W.2d 718, 722 (Tex. Crim. App. 1979); *see also* Tex. R. Evid. 609. This is because evidence of prior convictions and extraneous bad acts "is inherently prejudicial, tends to confuse the issues in the case, and forces the accused to defend himself against charges which he had not been notified would be brought against him." *Albrecht v. State*, 486 S.W.2d 97, 100 (Tex. Crim. App. 1972), *quoted in Prescott v. State*, 744 S.W.2d 128, 132 (Tex. Crim. App. 1988).

However, an exception to this rule applies when a witness makes statements concerning his past conduct that suggest he has never been arrested, charged, or convicted of any offense. *Delk v. State*, 855 S.W.2d 700, 704 (Tex. Crim. App. 1993); *Prescott*, 744 S.W.2d at 131.

6

Where a witness "creates a false impression of law abiding behavior, he 'opens the door' on his otherwise irrelevant past criminal history and opposing counsel may expose the falsehood." *Delk*, 855 S.W.2d at 704. Although the State agrees that generally details of prior convictions are inadmissible, it contends that Arebalo opened the door by saying on direct examination that he had seen somebody get shot before, but omitting that he had been the shooter. On cross-examination, the State sought to clarify that *he* had done the shooting, to clear up any false impression he may have left with the jury about his fear, warranted or not, during the SUV chase.

The admission of evidence is a matter within the discretion of the trial court. *See Montgomery v. State*, 810 S.W.2d 372, 378 (Tex. Crim. App. 1990). Accordingly, the trial court's admission of evidence is reviewed for an abuse of discretion. *Salazar v. State*, 38 S.W.3d 141, 153 (Tex. Crim. App. 2001); *Montgomery*, 810 S.W.2d at 379-80. If the trial court's ruling was within the "zone of reasonable disagreement," there is no abuse of discretion, and we must uphold the trial court's ruling. *Salazar*, 38 S.W.3d at 153-54; *Rachal v. State*, 917 S.W.2d 799, 807 (Tex. Crim. App. 1996).

"[W]hen an accused testifies gratuitously as to some matter that is irrelevant or collateral to the proceeding, as with any other witness he may be impeached by a showing that he has lied or is in error as to that matter." *Hammett v. State*, 713 S.W.2d 102, 105 (Tex. Crim. App. 1986). When an accused falsely insinuates that he has never been "in trouble" with the law or otherwise makes a false assertion on a collateral matter, the State may expose that falsehood. *Id.*

> The inference that is permissible from such exposure is that if the accused lied or was in error as to a collateral matter (especially one implicating his aptitude for getting in trouble with the law), he is likely to have lied or been in error in the balance of his

7

> testimony—those aspects of his testimony that *are* relevant to material issues in the case. This is a proper impeachment function.

*Id.* at 105-06.

Also, the rule of optional completeness provides in part that when a portion of an act is given in evidence by one party, the whole of the same subject may be inquired into by the other, and any other act that is necessary to make it fully understood or to explain the same may also be given in evidence. Tex. R. Evid. 107; *Wright v. State*, 28 S.W.3d 526, 535-36 (Tex. Crim. App. 2000); *Gutierrez v. State*, 85 S.W.3d 446, 456 (Tex. App.—Austin 2002, pet. ref'd). "When the defendant 'opens the door' on an issue by attempting to present an incomplete picture of an incident, the State is permitted to complete the picture by presenting evidence that would have otherwise been inadmissible." *Skillern v. State*, 890 S.W.2d 849, 864 (Tex. App.—Austin 1994, pet. ref'd) (citing *Lucas v. State*, 791 S.W.2d 35, 53-54 (Tex. Crim. App. 1989)). There are, however, two limitations to the scope of the door "opened" by a party under such circumstances: "One, only parts or items germane to the part or item offered ('on the same subject') become admissible. Two, the matter offered on the justification of completeness may be excluded under Rule 403 [of the rules of evidence] if its prejudicial effect substantially outweighs its probative value." *Fuentes v. State*, 991 S.W.2d 267, 279 (Tex. Crim. App. 1999) (quoting Steven Goode et al., 1 Texas Practice Guide to the Texas Rules of Evidence: Civil and Criminal § 107.1, at 41 (West 1993)). Evidence that is used to fully explain a matter opened by the other party need not be otherwise admissible. *Gutierrez*, 85 S.W.3d at 456; *see Parr v. State*, 557 S.W.2d 99, 102 (Tex. Crim. App. 1977). Thus, the issue we

must determine is to what extent the colloquy on direct examination "opened the door" to impeachment of Arebalo by the details of his prior convictions.

The context of the discussion on direct examination did not concern Arebalo's past peccadillos, but rather the sequence of events as he remembered them on the night of August 7, 2002. His response to the question, "Have you ever seen anybody get shot?" did not on its face implicate his past offenses or convictions or leave a false impression about the existence of past offenses; it was simply not made in that context. Thus, we conclude that the State could not have elicited the testimony under the *Hammett* line of cases. *See* 713 S.W.2d at 105-06. However, his answer was "incomplete" in the sense of the rule of optional completeness. He provided details on only a portion of the shooting he witnessed—he said that he had seen somebody get shot, without elaborating. Pursuant to the rule of optional completeness, the State was entitled to cull details to paint a broader picture of the event referred to by Arebalo—who was shot, who did the shooting, when did it happen, and similar details—provided the details were "on the same subject" as the shooting referred to by Arebalo and the prejudicial value of such testimony did not substantially outweigh its probative value. *See Fuentes*, 991 S.W.2d at 279. Although the details of the shooting itself were "on the same subject," the State went beyond clarifying any possible misconception Arebalo created by delving into his defensive strategy in the prior conviction (self-defense), whether he accepted a plea bargain, and whether such defensive strategy "worked."

Moreover, the prejudicial value of the details underlying the shooting and conviction proceedings must not have substantially outweighed their probative value. *See id.* Delving into the details of the shooting was prejudicial because it forced Arebalo to defend himself against charges

9

that were not the subject of the present suit, implied that he was a violent man, and suggested that the current offense was in conformity with that character. *See* Tex. R. Evid. 404(b); *Albrecht*, 486 S.W.2d at 100. There was little, if any, probative value gained from the admission of the evidence. The jury had already heard Arebalo's testimony that he was frightened to go into the room with Wood; he then testified that he was worried he would be shot by the people in the SUV. However, he had not seen the SUV or its occupants before he entered the room. Thus, his testimony about being frightened that he might be shot created no link between his earlier fear of entering the room with Wood and his later fear that the SUV's occupants had a gun. We agree with Arebalo that the trial court improperly permitted the State to elicit the testimony about the details of his conviction and his strategy of self-defense.

Having held that it was error to allow the State to question Arebalo about the details of his prior convictions, we must determine whether that error was harmful. *See Hammett*, 713 S.W.2d at 106-107. An appellate court may not reverse for non-constitutional error if the court, after examining the record as a whole, has fair assurance that the error did not have a substantial and injurious effect or influence in determining the jury's verdict. *Garcia v. State*, 126 S.W.3d 921, 927 (Tex. Crim. App. 2004); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). The erroneous admission of evidence is nonconstitutional error. *See Johnson*, 967 S.W.2d at 417; *Tate v. State*, 988 S.W.2d 887, 890 (Tex. App.—Austin 1999, pet. ref'd). An error is harmless if it had either no impact, or only a slight influence, upon the verdict. *Johnson*, 967 S.W.2d at 417. If the reviewing court is unsure whether the error affected the outcome, it should treat the error as harmful.

10

*Webb v. State*, 36 S.W.3d 164, 183 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (citing *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995)).

Among the factors a court should consider in conducting its harm analysis are: (1) the testimony and physical evidence admitted; (2) the nature of the evidence supporting the verdict, including whether this evidence was overwhelming; (3) the character of the alleged error and how it might be considered in connection with other evidence in the case; (4) the jury instructions; (5) the State's theory and any defensive theories; (6) closing arguments; (7) voir dire; and (8) whether the State emphasized the error. *See Motilla v. State*, 78 S.W.3d 352, 355-57 (Tex. Crim. App. 2002).

The first two factors weigh against a finding that the error was harmful. Wood testified regarding the circumstances leading up to the point at which she "blacked out" and could not remember the details of her assault. Importantly, she denied any intent to rob Arebalo or otherwise harm him; rather, she testified that for no reason Arebalo "went ballistic." She and Arebalo went to her hotel room so that she could perform sexual acts on him in exchange for money. Arebalo himself testified that Wood did not verbally threaten to harm him or physically attempt to harm him, except when she pushed him and tried to put her hands on his arms. She had no weapon. According to Arebalo, she lunged for the wallet in his back pocket, at which point he punched her once in the face, followed by another slap or punch across her teeth once she regained her balance. Two officers testified about the extent of Wood's injuries, stating that they were more extensive than the harm that a mere punch and a slap would likely cause, casting doubt on Arebalo's credibility. Also, there was no evidence of defensive wounds on Arebalo. Furthermore, the jury saw photographs depicting Wood's gruesome facial injuries, blood stains throughout the hotel room and

11

on Arebalo's clothing and shoes, and Arebalo's swollen hand.[2]  The jury also saw the size, weight, build, and height of both Wood and Arebalo, as well as their respective demeanors, which it may have considered in determining whose testimony to believe.

The third factor concerns the character of the error and weighs somewhat in favor of a finding of harmful error because the error permitted the State prejudicially to infer that Arebalo had a violent character, was likely to have acted in conformity with that character, and had falsely relied on "self-defense" before.  As the success of his defense rested largely on his own testimony, Arebalo's defensive theory was unfairly prejudiced by the State's line of questioning.  However, although Arebalo's defensive theory was prejudiced by the State's probing, he had already admitted that he had two prior convictions related to deadly weapons, one for the violent crime of aggravated assault.  Thus, although the jury did not know what kind of weapon Arebalo had used in the first conviction until the State elicited the improper testimony, the fact of the conviction itself indicated some propensity towards violence and could have weighed against his credibility.

The fourth and fifth factors weigh against a finding of harmful error.  The jury was instructed to acquit Arebalo if the evidence proved that he acted in self-defense beyond a reasonable doubt. The jury was instructed on the law regarding use of deadly force in self-defense:

A person is justified in using deadly force against another:

(1)  if he would be justified in using force against the other under Section 9.31 [allowing use of force against another if defendant reasonably believes force is

---

[2]  The jury saw a photograph of Arebalo taken just after the assault.  His blood-stained tee-shirt read, "I am one of those bad things that happen to good people."  The State emphasized the slogan in its closing arguments.

immediately necessary to protect himself against other's use or attempted use of unlawful force];

(2) if a reasonable person in the actor's situation would not have retreated; and

(3) when and to the degree he reasonably believes the deadly force is immediately necessary:

   (A) to protect himself against the other's use or attempted use of unlawful deadly force; or

   (B) to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery.

Tex. Pen. Code Ann. § 9.32 (West 2003). One may use deadly force only if he reasonably believes the force is necessary either to protect himself from deadly force or to prevent an imminent violent crime such as robbery. *See id.* Arebalo testified that Wood only pushed him and attempted to strike him and put her hands on his arms. At no time did Wood attempt to use deadly force against Arebalo. If Wood indeed was attempting to rob Arebalo, he still had to have reasonably believed that he needed to use the degree of deadly force he used in order to prevent the robbery. Assuming Arebalo was justified in punching Wood the first time, he could not have reasonably believed that he needed to hit her in the face again after she had fallen to the floor and he could have retreated.

During voir dire and Arebalo's testimony, the defense propounded a theory about why Wood might attempt to rob Arebalo and how she might do that. Defense counsel suggested that recent news stories revealed that undocumented immigrant workers from Mexico were targets for robberies because they typically carry large sums of cash because they cannot open bank accounts without proper identification. Defense counsel suggested that one way to rob such an individual

13

would be to use a group of people; he implied that Wood's acquaintances in the SUV were a part of the robbery plan. Arebalo testified that Wood's phone call to her friends in the hotel room made him nervous and that he was afraid to go to the room but went anyway. However, Arebalo also testified that he did not see the SUV and its occupants before or even immediately after the incident; it was only after he fled that he noticed the SUV following him. During voir dire, the State emphasized that it was the jury's duty to determine witness credibility and the weight to be given to individual pieces of evidence.

With respect to the final two factors, Arebalo argues that the State emphasized the error and mentioned the inadmissible testimony in closing argument by bringing up the fact that Arebalo had shot somebody before. The State did refer to the shooting incident during its closing argument: "You don't hit somebody two times, have blood on your shoes and do this. I mean, it shows you his credibility. He is a violent individual. You know he has been to the penitentiary before. You know what he's capable of. You know he's shot somebody before. You can take all that into consideration when judging his credibility." Arebalo's counsel immediately objected, "that is extremely prejudicial. He's not on trial for shooting somebody right now. I objected before when it was admitted. I am going to object again." After a brief discussion at the bench, the trial court sustained the objection and instructed the jury to disregard the last remark of the prosecutor. Instructions to disregard are presumed to be effective unless the facts of the case suggest the impossibility of withdrawing the impression produced on the minds of the jury. *See Waldo v. State*, 746 S.W.2d 750, 754 (Tex. Crim. App. 1988). Because this was the most recent ruling by the court on the topic of Arebalo's prior shooting and its relevancy to the current proceedings, it likely defused

14

Arebalo's earlier testimony about the shooting. In any event, we conclude that the court's instruction to disregard cured any prejudicial effect from the State's reference to the shooting in its closing argument. Also, we again note that the fact of Arebalo's two deadly-weapon convictions had already been properly admitted and could have created suspicion about his violent nature or doubt about his credibility.

Arebalo also asserts that we should consider an additional factor: whether declaring the error harmless would encourage the State to repeat such behavior with impunity. *See Harris v. State*, 790 S.W.2d 568, 587-88 (Tex. Crim. App. 1989) (after erroneous admission of evidence on prior extraneous bad acts, State made only passing reference to them in closing argument and record did not show State was attempting to taint trial process); *Murphy v. State*, 44 S.W.3d 656, 666 (Tex. App.—Austin 2001, no pet.) (jury-instruction error was harmful in itself, and declaring it harmless would encourage repetition); *Garza v. State*, 963 S.W.2d 926, 930-31 (Tex. App.—San Antonio 1998, no pet.) (erroneous admission of photographs was not harmful because, among other reasons, State did not exploit use of them, and thus there was no indication that harmless finding would encourage repetition). As noted, the State did not emphasize the evidence except for one mention of the shooting in closing argument, after which the court immediately instructed the jury to disregard the comment. Also, the nature of the error was more akin to a mistake of judgment by the State than an intentional attempt to taint the trial process—the State overzealously seized upon defense counsel's question about Arebalo's seeing someone get shot as an opportunity to squeeze through the door "opened" by Arebalo and paint a fuller, more negative portrait of him.

15

On balance, even if the events happened exactly as Arebalo testified, we are fairly assured that the erroneous admission of the State's line of questioning about the details of Arebalo's prior convictions did not have a substantial and injurious effect or influence on the jury's verdict. Arebalo's violent responses to Wood's alleged attempts to steal his wallet and to prevent him from leaving the room were unwarranted escalations in force. According to Arebalo's own testimony, the following progression of events occurred: Wood sat on Arebalo's lap and became affectionate with him; next she got up, "pushe[d] [him] back," and told him that he was not going anywhere, blocking the door; as he approached her, she talked about how much she needed money and "c[ame] up close" to him; Arebalo took a step back, demanding that she get out of the way and let him out; she then came at him and tried to strike him, putting her hands on his arms to keep him from leaving; he then punched her on the left side of her face, knocking her down and causing her head to hit the corner of the bed; when Wood then stood up, caught her balance, and started yelling, Arebalo hit her the second time in the teeth. Arebalo testified that Wood never threatened to hurt him, did not have any weapons, and said nothing about having a gang of friends outside waiting to rob him. He also testified that he did not hit Wood on the right side of the face, only on the left and in her teeth; however, the pictures indicate severe injuries to both sides of her face. When he saw the police officers, Arebalo attempted to run away. When finally apprehended by the police, Arebalo did not report any attempt by Wood to rob him.

Considering all of the factors and this record in its entirety, we have a fair assurance that the State's questions to Arebalo, eliciting the details of his prior convictions and implying that

Arebalo was by nature a violent man, did not have a substantial and injurious effect on the jury's verdict. We thus overrule Arebalo's sole point of error.

## CONCLUSION

The trial court erred in admitting Arebalo's testimony about the details of his prior convictions; however, because we conclude that the error was harmless, we affirm the judgment of conviction.

_____

Bea Ann Smith, Justice

Before Justices Kidd, B. A. Smith and Pemberton

Affirmed

Filed:   August 12, 2004

Publish