# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
## NO. 03-06-00232-CR
---

**Rhonda Glover, Appellant**

**v.**

**The State of Texas, Appellee**

---
### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT
### NO. 3041561, HONORABLE MICHAEL LYNCH, JUDGE PRESIDING
---

## M E M O R A N D U M   O P I N I O N

The jury convicted Rhonda Glover of the offense of murder. *See* Tex. Penal Code Ann. § 19.02(b)(1) (West 2003). Punishment was assessed at 46 years' imprisonment. In four points of error, Glover asserts that the district court abused its discretion by refusing to submit an instruction on the lesser-included offense of criminally negligent homicide, admitting evidence seized from Glover's apartment, and excluding evidence related to extraneous offenses allegedly committed by the victim. We affirm the judgment.

## BACKGROUND

The jury heard evidence that on July 25, 2004, authorities discovered the body of James "Jimmy" Joste in an upstairs hallway at Glover's home in southwest Austin. Evidence at the crime scene established that Joste had been shot to death. William Gibbons, a bloodstain pattern analyst with the Austin Police Department, analyzed the bloodstains found around Joste's body and

testified about his findings. According to Gibbons, Joste was first shot in the bedroom, near the entry door. The bloodstains indicated that Joste then moved from the bedroom into the hallway as the shooting continued:

> Basically, the victim . . . was in an upright position or near an upright position in or around the doorway. . . . He started to work his way through the hallway, we see that from the increased [blood] concentration. At some point . . . there was a bullet that went through him and into the wall while he was traveling down the hallway. . . . Basically, he was shot in the hallway, that is what caused the high velocity impact stains. He starts to slow down, which is indicative of a gunshot injury, he actually stops here, staggers a little forward, stops here for a few seconds, and then he goes to the ground.

An autopsy confirmed that Joste died of multiple gunshot wounds. Roberto Bayardo, M.D., chief medical examiner for Travis County, testified that there were a total of 13 gunshot wounds to Joste's chest, abdomen, arm, and groin areas. Of the 13 wounds, Dr. Bayardo characterized three as exit wounds, which indicated that Joste had been shot 10 times. The wounds to the arm were characterized as defensive wounds which, according to Bayardo, "are the ones that the victims have when they are trying to shield themselves from the assailant." Bayardo also testified that the angle of at least one of the bullet wounds indicated that Joste was shot at least once while he was lying on the ground. Shell casings from six bullets were found near Joste's body, and an additional four shell casings were recovered in the bedroom. The shell casings were determined to have been fired from a Glock 19 nine-millimeter semiautomatic handgun.

The lead investigator in the case was Detective Keith Walker of the Austin Police Department. Detective Walker testified that Glover became a suspect early in the investigation when

2

the police discovered that she and Joste had been involved in a romantic relationship and had a nine-year-old son, J.C. The police could not locate Glover and J.C., and they issued a nationwide alert.

During the search of Glover's residence, the police found a business card from Red's Indoor Shooting Range. Walker testified that a call was made to the business, and a Red's employee informed the police that Glover had purchased a nine-millimeter handgun on June 29, 2004. Mack Farrel, the general manager of Red's, earlier testified and confirmed that Glover had purchased a Glock 19 nine-millimeter semiautomatic pistol. The police also determined that Glover had rented a recreational vehicle on July 21. On July 27, authorities located Glover and her son in the RV in Ellis County, Kansas. Walker testified that Glover was arrested pursuant to a federal warrant for a firearms violation. During a search of the RV, authorities discovered a Glock nine-millimeter handgun.

Following her arrest, Walker interviewed Glover. During the interview, Glover gave Walker permission to search an apartment in Houston in which she sometimes resided. Inside the apartment, Walker found a business card for Americo Mastroianni, an instructor at Top Gun Shooting Range in Houston. A photograph of the business card was admitted into evidence. Earlier in the investigation, Walker had received information from Joste's brother about Glover's connection to Mastroianni. Joste's brother had informed Walker that the owner of the shooting range called him and indicated that Glover had been practicing at the range and that Mastroianni was her instructor. As a result of this information, Mastroianni had already been contacted and interviewed by the police before the business card was discovered.

3

Mastroianni testified during trial. Mastroianni recounted how in May 2004 he had first instructed Glover and her son in the use of firearms and that Glover had rented a Glock handgun for the lessons. One of the procedures Mastroianni taught Glover was the "double tap," which is the technique of gently but quickly pulling a trigger twice in rapid succession. Mastroianni explained that during the lessons Glover was able to hit the practice targets "[v]ery efficiently." On July 10, Glover returned to the shooting range with her son, purchased ammunition from Mastroianni, and proceeded to the practice range, this time shooting without supervision. On July 15, Glover again returned to the shooting range. On this occasion, according to Mastroianni, Glover brought her own weapon, which Mastroianni recognized as a Glock 19 handgun. Glover asked Mastroianni if he offered advanced firearms training. Mastroianni told her that he did, and he scheduled a lesson with Glover for the following week. Mastroianni testified that Glover wanted him to teach her about "very specific scenarios" that went beyond his standard defensive training course:

> She wanted to learn how to efficiently make sure her house was clear of any intruders. She had stated to me that she had a home in Austin and a home in Houston and when she would go back to her home in Austin, she noticed food missing out of the refrigerator and things moved around like people were staying in her home, so she literally drew me a floor plan of her house and wanted to learn how to walk in the house and make sure that there were no intruders in her home.

Mastroianni testified that during the lesson, as they were going over the various scenarios, Glover asked him how she should shoot somebody that was sitting on her sofa in the living room while she was behind the sofa in the kitchen. Mastroianni asked Glover why she would want to shoot someone who was sitting on her sofa, and Glover replied that the person sitting on the sofa might turn around and point a gun at her and that she wanted to be prepared for the "worst-case

4

scenario." Mastroianni explained to her how to shoot the person, and Glover inquired further about how to "go around to the front of the couch and shoot him again and make sure he is dead." Mastroianni informed Glover that "we don't do that. If you have already fired on the threat, your next job is to get out of there and call 911." Glover then proceeded to practice the various shooting scenarios, and Mastroianni testified that Glover successfully engaged and hit the practice targets. Mastroianni explained that Glover "caught on [to] everything that we went over extremely fast for somebody who . . . did not have this type of training. She caught on very, very fast."

Mack Farrel, the general manager of Red's Indoor Shooting Range, testified that Glover came to the range on July 21, 2004—the day that the State alleged Glover shot Joste—and practiced shooting her gun. According to Farrel, after Glover was done, she showed Farrel her practice target and asked him if she had improved since she first bought her gun on June 29. Farrel told her that she had improved "tremendously."

Glover testified in her own defense and admitted to shooting Joste. However, she claimed that the shooting was in self-defense. Glover testified that during their relationship, Joste was physically abusive toward her and that, on the day of the shooting, Joste confronted her in her bedroom, choked her, and threatened to kill her. Glover then "pulled [her] gun out and shot him." On cross-examination, when the State asked Glover if she "started pulling the trigger and just never stopped," Glover claimed that "the gun just went off, it just perpetuated."

Because of Glover's self-defense claim, a central question during trial was the nature of Glover's relationship with Joste. Rocky Navarro testified that he had known Joste for over 15 years and Glover for approximately 20 years, and that Joste and Glover had been dating

5

intermittently for approximately 15 years. According to Navarro, Glover and Joste "were living as if they were married," even though "they were never married." In 1994, Glover and Joste had a child together, J.C. When asked if he ever saw Joste mistreat Glover, Navarro testified, "Never." In Navarro's opinion, Joste "worshiped [Glover], he loved her more than [Navarro] could describe." Navarro went on to explain that Joste provided for Glover by buying her homes and cars and that Joste "supported her as if she was his wife." In fact, Navarro testified that Joste had paid for Glover's home in southwest Austin. Navarro also characterized Joste as an "extremely submissive" person whom Navarro had never known to be violent.[1] Another friend of Joste's, Danny Davis, testified that Joste was "passive" and "docile" while Glover was "aggressive verbally." Davis also testified that Joste loved Glover "[w]ith all his heart." Christy Dillon, a friend of the couple's, testified that she and her husband had witnessed Glover physically assault Joste at a barbecue after Glover had been drinking: "She punched him in the face and put him on the ground and . . . my husband and myself tried to pull them apart because she was beating him, on top of him."

Patricia Swenson was also friends with both Joste and Glover. Swenson testified about a conversation she had with Glover in May 2004 in which Glover told her that Joste "was the devil and that [Glover] had to get rid of him." When asked what Glover said about how she was going to "get rid of" Joste, Swenson testified that Glover told her that she planned on seducing Joste at the house, handcuffing him to the bed, cutting off his genitals, and setting the house on fire.

---

[1] There was evidence introduced that on one occasion, Joste pleaded no contest to assaulting Glover. However, Robert Dillon, a friend of the couple's, testified that Glover admitted to him that Joste "really did not beat her up," that the incident was her fault, and that the incident was "blown out of proportion."

Pursuant to the rule of optional completeness, *see* Tex. R. Evid. 107, on cross-examination, defense counsel attempted to elicit testimony about the entire conversation between Glover and Swenson in order to explain why Glover was upset with Joste. Specifically, defense counsel wanted Swenson to testify that Glover was upset with Joste because he was involved with child pornography and that he had sexually abused J.C. Finding that this testimony would be more prejudicial than probative, the district court did not allow its admission. *See* Tex. R. Evid. 403. The district court also did not allow Glover to testify about the sexual-abuse allegations. However, at one point during her cross-examination, Glover disregarded this order, stating, "I thought during this trial and testimony that . . . I would be able to determine that Jimmy had in fact molested my son."

The court's charge to the jury included an instruction on the law of self-defense. However, during the charge conference, Glover also requested an instruction on the offense of criminally negligent homicide. Finding that the offense was not "properly raised by the evidence," the district court denied the request. The jury found Glover guilty of murdering Joste. Following a hearing before the jury on punishment, Glover was sentenced to 46 years' imprisonment. This appeal followed.

## DISCUSSION

### Jury charge

In her first point of error, Glover argues that the district court should have instructed the jury on the offense of criminally negligent homicide. We review the trial court's decision regarding a lesser-included-offense charge for abuse of discretion. *See Threadgill v. State*,

146 S.W.3d 654, 666 (Tex. Crim. App. 2004); *Dobbins v. State*, 228 S.W.3d 761, 768 (Tex. App.—Houston [14th Dist.] 2007, no pet. h.).

A charge on a lesser-included offense should be given when (1) the lesser-included offense is included within the proof necessary to establish the offense charged, and (2) there is some evidence that would permit a rational jury to find that the defendant is guilty of the lesser offense but not guilty of the greater. *Salinas v. State*, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005). "In other words, there must be some evidence from which a rational jury could acquit the defendant of the greater offense while convicting him of the lesser-included offense." *Feldman v. State*, 71 S.W.3d 738, 750-51 (Tex. Crim. App. 2002). "The evidence must establish the lesser-included offense as a valid rational alternative to the charged offense." *Id*. at 751. The district court must consider all evidence presented at trial to make this determination. *See Rousseau v. State*, 855 S.W.2d 666, 673 (Tex. Crim. App. 1993); *Trujillo v. State*, 227 S.W.3d 164, 167 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). If the evidence raises the issue of a lesser-included offense, a jury charge must be given based on that evidence, "whether produced by the State or the defendant and whether it be strong, weak, unimpeached, or contradicted." *Trujillo*, 227 S.W.3d at 167-68 (quoting *Rousseau*, 85 S.W.2d at 672).

Because criminally negligent homicide is a lesser-included offense of murder, the first requirement is satisfied. *See Saunders v. State*, 840 S.W.2d 390, 391 (Tex. Crim. App. 1992). Thus, the controlling issue here is whether there was some evidence presented at trial that would have permitted a rational jury to acquit Glover of murder and find her guilty only of criminally negligent homicide.

A person commits the offense of criminally negligent homicide if he causes the death of an individual by criminal negligence. Tex. Penal Code Ann. § 19.05(a) (West 2003). Criminal negligence is characterized by the actor's failure to perceive the risk created by his conduct. *See id*. § 6.03(d) (West 2003). If the evidence shows that the defendant's awareness is such that he perceived the risk his conduct created, he is not entitled to a charge of criminally negligent homicide. *Thomas v. State*, 699 S.W.2d 845, 850 (Tex. Crim. App. 1985); *Trujillo*, 227 S.W.3d at 168.

"Every case in which someone points a loaded gun at another does not require that a charge on criminally negligent homicide be given. Nor does the allegation of accidental discharge necessarily raise the issue." *Thomas*, 699 S.W.2d at 850. "The attendant circumstances from which the defendant's mental state can be inferred must be collectively examined in light of the definition of criminally negligent conduct." *Martinez v. State*, 87 S.W.3d 663, 666 (Tex. App.—San Antonio 2002, pet. ref'd) (citing *Thomas*, 699 S.W.2d at 850). "Evidence that a defendant knows a gun is loaded, that he is familiar with guns and their potential for injury, and that he points a gun at another indicates a person who is aware of a risk created by that conduct and disregards the risk." *Trujillo*, 227 S.W.3d at 168 (quoting *Thomas*, 699 S.W.2d at 850). Such a person is "at least reckless." *Id*.

The evidence at trial established that at the time of the shooting, Glover was familiar with firearms, had practiced on multiple occasions using the specific firearm that was used in the shooting, and had received lessons in "advanced firearms training" involving "very specific scenarios." Glover's instructor, Americo Mastroianni, testified that Glover was "very efficient" at hitting targets, and Mack Farrel, the general manager of Red's Indoor Shooting Range, testified that Glover had improved her shooting technique "tremendously" from the day she purchased her gun

9

to the day of the shooting. In light of this evidence, no rational jury could have found that Glover was unaware of the risks associated with her use of firearms or with her firearm in particular.

Furthermore, the physical evidence at the crime scene established that Joste was shot 10 times, and that some of the bullet wounds and bloodstain patterns found around his body indicated that Joste was shot while he was retreating from the shooter and after he had already fallen to the ground. This evidence, along with Glover's own testimony, excluded criminally negligent homicide as a "valid rational alternative" to murder:

[Defense Counsel]:   Tell the jury [what happened].

[Glover]:   I had the gun with me. He came into the bedroom. I had it tucked into my pants so that he wouldn't see it so that I could, you know, if I needed to use it, I could have it safe.

. . . .

[Defense Counsel]:   What happened next?

[Glover]:   He was choking me, and I reached in and pulled my gun out and shot him. I shot him. Because I thought he was going to kill me.

[Defense Counsel]:   You emptied the gun, didn't you?

[Glover]:   I emptied the gun in him, yes, I did.

On cross-examination, Glover provided additional testimony about what happened during the shooting:

[State]:   Ms. Glover, your earlier testimony on direct was that you and he basically met at the threshold of the door?

10

| | |
|---|---|
| [Glover]: | Yes, and he began choking me. |
| [State]: | He began choking you. And you are going towards him pointing a gun at him, right? |
| [Glover]: | Yes. |
| [State]: | Going towards him, yes? |
| [Glover]: | Yes. |
| [State]: | And is that the way they taught you in the defensive use of firearms to deal with a dangerous situation? |
| [Glover]: | Yes. |
| [State]: | To go at it with a gun? |
| [Glover]: | Yes. |
| [State]: | And he begins choking you, and you have shot this gun a number of times, correct? |
| [Glover]: | Yes. |
| [State]: | And if you shot it a number of times, you know how to shoot the gun, and how is it that your testimony now, I assume, is that you started pulling the trigger and just never stopped, right? |
| [Glover]: | It just—the gun just went off, it just perpetuated. |

Glover asserts that this last statement, that "the gun just went off, it just perpetuated" is some evidence of negligence. However, this statement is, at most, evidence of accidental discharge. As we have already explained, accidental discharge alone is not enough to warrant an instruction on criminally negligent homicide. *See Thomas*, 699 S.W.2d at 850. "Other evidence raising the issue of whether or not a defendant was aware of the risk must be presented before such

11

charge is required." *Id*. On this record, we conclude there was no evidence that would permit a rational jury to acquit Glover of murder while convicting her of criminally negligent homicide and that, accordingly, the district court did not abuse its discretion in refusing the instruction. We overrule Glover's first point.

**Admission of evidence seized in Glover's apartment**

In her second point, Glover contends that the district court erred in admitting evidence seized in her Houston apartment. Specifically, Glover argues that the State failed to prove that she "freely and voluntarily consented to the search of her apartment." The basis of this complaint during trial was that on November 1, 2004, Glover had been found incompetent to stand trial, although she was later found competent to stand trial. At the competency hearing, Detective Walker's videotaped interview of Glover—in which Glover consented to the search of her apartment—was admitted as evidence of Glover's incompetence. Glover contends that if the interview is evidence of her incompetence to stand trial, then it is also evidence that she was incompetent to give her consent to search the apartment.

We need not address the merits of this issue because any error in admitting the evidence was harmless. The erroneous admission of evidence obtained in violation of the Fourth Amendment is constitutional error. *Hernandez v. State*, 60 S.W.3d 106, 106 (Tex. Crim. App. 2001). If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. Tex. R. App. P. 44.2(a).

12

We are convinced beyond a reasonable doubt that the evidence seized from Glover's apartment, even if erroneously admitted, did not contribute to Glover's conviction or punishment. The only incriminating evidence found in Glover's Houston apartment was Mastroianni's business card. Glover argues that "[l]inking appellant to Mastroianni was a critical part of the State's case at trial. He provided damaging testimony concerning the handgun training offered to appellant and her request for advanced training to 'take out' a perceived home intruder." However, Glover overlooks the fact that this link was already established prior to the admission of the evidence seized from Glover's apartment. The photograph of the business card was admitted into evidence during Detective Walker's testimony, two days after Mastroianni had already testified extensively about his training of Glover, and it was during Mastroianni's testimony that the district court admitted into evidence documents establishing Glover's connection to the shooting range where Mastroianni worked, including waiver and release forms from the shooting range signed by Glover and sales receipts of the lessons and items that she purchased. Furthermore, Detective Walker testified that when he discovered the business card during the search of Glover's apartment, he had already received information about Glover's connection to Mastroianni and that Mastroianni had already been contacted and interviewed by authorities.

We conclude that any error in admitting the evidence from the apartment, which Glover contends should have been suppressed, was rendered harmless by the admission of other properly admitted evidence establishing her connection to Mastroianni. *See Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999). We overrule Glover's second point.

**Exclusion of victim's alleged extraneous offenses**

In her third point, Glover asserts that the district court abused its discretion in excluding the complete conversation between Swenson and Glover in which Glover expressed a desire to "get rid of" Joste. In her fourth point, Glover asserts that the district court abused its discretion by not allowing Glover to testify about her allegations that Joste had sexually abused their child and that Joste had physically assaulted her on prior occasions.

First, we note that, contrary to Glover's assertion, the district court did not exclude evidence of Joste's alleged assaults of Glover. Several witnesses testified about the incident in which Joste pleaded no contest to assaulting Glover, and Glover was allowed to testify about multiple instances in which Joste allegedly assaulted her.

As for the sexual-abuse allegations, we review a trial court's decision to admit or exclude evidence for abuse of discretion. *Oprean v. State*, 201 S.W.3d 724, 726 (Tex. Crim. App. 2006) (citing *Martinez v. State*, 867 S.W.2d 30, 39 (Tex. Crim. App. 1993)). Unless the trial court's decision was outside the "zone of reasonable disagreement," an appellate court should uphold the ruling. *Id*. (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991)).

First, Glover argues that the entire conversation between Glover and Swenson, during which Glover told Swenson that she wanted to "get rid of" Joste, should have been admitted into evidence pursuant to the "Rule of Optional Completeness." The rule provides, "When part of an act, declaration, conversation, writing or recorded statement is given in evidence by one party, the whole on the same subject may be inquired into by the other, and any other act, declaration, writing or

recorded statement which is necessary to make it fully understood or to explain the same may also be given in evidence. . . .” Tex. R. Evid. 107. The court of criminal appeals has explained,

> “It is well established that the evidence which is used to fully explain a matter opened up by the other party need not ordinarily be admissible.” Thus, the necessity of completeness will justify the introduction, through the “open door,” of extraneous offense evidence, hearsay, or other matter that would otherwise be incompetent.

*Fuentes v. State*, 991 S.W.2d 267, 279 (Tex. Crim. App. 1999) (quoting 1 Steven Goode et al., *Texas Practice Guide to the Texas Rules of Evidence: Civil and Criminal* § 107.1 at 41 (West 1993)). Thus, because the State “opened the door” to evidence about one part of Glover’s conversation with Swenson, evidence about other parts of that same conversation might have been rendered admissible.

However, there are two exceptions to this rule: “One, only parts or items germane to the part or item offered (‘on the same subject’) become admissible. Two, the matter offered on the justification of completeness may be excluded under Rule 403 if its prejudicial effect substantially outweighs its probative value.” *Id*.; *Arebalo v. State*, 143 S.W.3d 402, 408 (Tex. App.—Austin 2004, pet. ref’d).

In this case, the district court conducted a balancing test and found that the prejudicial effect of the offered evidence outweighed its probative value pursuant to rule 403. A proper rule 403 analysis includes, but is not limited to, the following factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent’s need for the evidence. *Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004). “In evaluating the trial court’s determination under rule 403, a reviewing court is to reverse the trial court’s

judgment 'rarely and only after a clear abuse of discretion,' recognizing that the court below is in a superior position to gauge the impact of the relevant evidence." *Russo v. State*, 228 S.W.3d 779, 799 (Tex. App.—Austin 2007, no pet. h.) (citing *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999)). Trial courts deserve the greatest deference when, as was the case here, they have explicitly weighed and balanced these four factors, and articulated their rationale for admitting or excluding the evidence. *See Salazar v. State*, 90 S.W.3d 330, 337 (Tex. Crim. App. 2002).

Glover sought to admit evidence that the reason she wanted to "get rid of" Joste was because he was involved with child pornography and had sexually abused J.C. We find that the district court did not abuse its discretion in determining that this evidence was more prejudicial than probative. First, the probative value of the evidence is low. Glover argued at trial that the part of the conversation in which she alleged sexual abuse was probative of the fact that she was not serious about killing Joste but was merely expressing how upset she was with the situation. We agree with the district court that this evidence does not have a tendency to show that Glover's desire to "get rid of" Joste was any less serious. Second, because the evidence involves allegations that the victim was involved with child pornography and had sexually abused his child, the potential to impress the jury in some irrational, yet indelible, way is high. Third, the time needed to develop the evidence is high. As the district court explained when it made its ruling, admitting such evidence would essentially create a "side trial" in which the State would feel compelled to rebut the allegations with its own evidence that Joste was not involved in child pornography and did not sexually abuse his son. Developing this rebuttal evidence could take hours or even days in what was already a lengthy trial. Fourth, for the same reason that the probative value of the evidence is low, Glover's need for the

16

evidence is also low. It does not have a tendency to show that Glover was not serious about "getting rid of" Joste. In fact, it could be argued that the evidence might have the opposite effect by providing Glover with a motive to kill Joste. We conclude that the district court did not abuse its discretion in finding that the balance of the above factors weighs against admitting the complete conversation between Glover and Swenson.

Finally, Glover argues that the district court's decision to exclude Glover's testimony about the sexual-abuse allegations was an abuse of discretion. The record reflects only one occasion during Glover's testimony in which defense counsel attempted to elicit testimony about the sexual-abuse allegations. At one point, defense counsel asked Glover to "just tell the jury what happened that made you decide to leave Jimmy Joste after all these years?" Before Glover could answer this question, the State asked to approach the bench and objected to any testimony about sexual-abuse allegations. Defense counsel informed the district court that he did not know what Glover's answer would be, but he anticipated that Glover was going to testify in part that "she discovered [Joste] was sexually abusing [J.C.] and that led to a huge fight between [Glover and Joste]." The district court decided to "take that as a proffer" and sustained the State's objection.

It was not an abuse of discretion for the district court to exclude this testimony for the same reason it was not an abuse of discretion to exclude the complete conversation between Glover and Swenson—the evidence was more prejudicial than probative. *See* Tex. R. Evid. 403. The probative value of the evidence is low, as is Glover's need for the evidence to prove her theory of self-defense. In order to prove that theory, Glover needed to present evidence that she reasonably believed the use of deadly force was immediately necessary to protect herself against Joste's use or

17

attempted use of unlawful deadly force. *See* Tex. Penal Code Ann. § 9.32(a)(3) (West 2003). As previously explained, the district court did not abuse its discretion in finding that the balance of the rule 403 factors weighed in favor of excluding this evidence.

We overrule Glover's third and fourth points.

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed:   November 8, 2007

Do Not Publish