In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-16-00370-CR
_____

TYRRELL CECIL PETE, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 252nd District Court
Jefferson County, Texas
Trial Cause No. 13-17922

MEMORANDUM OPINION

In two evidentiary issues, Tyrrell Cecil Pete appeals his aggravated assault conviction. *See* Tex. Penal Code Ann. § 22.02(a)(1) (West 2011). Specifically, Pete argues the trial court erred in admitting lay-opinion testimony he contends was speculation and allowing the State to elicit details from him concerning prior offenses he admitted to committing during his direct examination. We overrule both of Pete's issues and affirm the trial court's judgment.

1

## Background

On October 4, 2013, Pete undisputedly shot and seriously injured J.S. What prompted the shooting is in dispute. There are two different versions of the events, one from J.S. and his sister C.C., and the other from Pete and his wife, O.P. Pete's former mother-in-law also testified. She was not directly involved with the parties' confrontation, but Pete contacted her several times throughout the morning prior to the shooting.

Pete and his wife operate a deli inside a gas station named Fuel Depot. C.C. testified she stopped by Fuel Depot the morning of the shooting to use the ATM. C.C. was sitting in her car when Pete pulled up next to her in his car. While sitting in their respective vehicles, C.C. and Pete, who was a good friend of C.C.'s husband, began a conversation about C.C. becoming romantically involved with another man while her husband was in prison. The conversation became heated, and both exited their vehicles and stood in the parking lot arguing. Pete's wife came out of Fuel Depot to intervene and told Pete to leave. C.C. testified that as Pete turned to leave, he told her he was coming back and "[h]e had something for [her.]" While C.C. understood Pete's statement as a threat, C.C. testified she never asked her brother or her brother-in-law, M.D., to go look for Pete or seek revenge. C.C. never saw J.S. or M.D. with a gun the day of the shooting.

According to J.S., the morning of the shooting M.D. informed him Pete threatened to kill C.C. J.S. told the jury he had just seen C.C. at the Fuel Depot, and C.C. did not appear to be upset. Later, J.S. and M.D. saw Pete on the road, pulled up next to him and asked him what happened between him and C.C. According to J.S., Pete told the men C.C. was lying about him threatening her. Pete told them C.C. approached him outside the Fuel Depot complaining that Pete was supposed to send her money while her husband was incarcerated. J.S. told the jury Pete did not appear mad after their conversation.

J.S. testified he and M.D. then returned to M.D.'s house. While M.D. was inside the house, J.S. and another acquaintance were sitting on M.D.'s front porch. Pete then pulled up to M.D.'s house and stated he heard J.S. and M.D. were looking for him, which J.S. denied. After Pete repeatedly stated that he heard J.S. and M.D. were looking for him, J.S. told Pete to leave. When Pete refused, J.S. left the porch and began walking towards Pete's vehicle. According to J.S., Pete told him not to come near his car. J.S. denied he had a weapon on him at the time and further denied telling Pete he had a gun or threatening Pete in any way. After Pete continued to refuse to leave, J.S. turned and began to walk away. In the meantime, M.D. came out of the house and told Pete to leave. J.S. testified Pete climbed out of his car and

suddenly started shooting, first toward M.D, then toward J.S. Pete shot J.S. several times in the back causing him serious bodily injury. Pete then drove off in his car.

Pete testified in his defense and provided a different version of events. Pete claimed as soon as he pulled up to Fuel Depot, C.C. instigated an argument, telling him he was to take care of her because her incarcerated husband, Pete's friend, told her that Pete would help her. Pete's wife then came outside and intervened. As Pete was leaving, C.C. allegedly called her brothers and told them to take care of Pete. Soon after leaving Fuel Depot, Pete said he encountered J.S. and M.D. in a car on the road. Per Pete's testimony, J.S. got out of the car and started to approach Pete's car, and M.D. got out of the same car with a gun. Pete left and called his former mother-in-law asking her to contact C.C., J.S., and M.D.'s family to have them stop threatening him because he was scared. Pete then returned to Fuel Depot, where he claimed his wife told him about someone coming in the store and threatening their family. Pete made more calls to his ex-mother-in-law wherein Pete explained that he felt further threatened. In response to the escalated situation, Pete decided to find J.S. and M.D. to work out the issue.

Pete testified that as he was driving down the street, J.S. came off M.D.'s porch, flagged Pete down in the middle of the street with a hand behind his back, and threatened Pete and his family repeatedly. Pete told the jury he asked J.S. not to

4

come up to Pete's vehicle with his hands behind his back. Pete explained while he and J.S. argued for a couple minutes, M.D. came out of his house with something in his hands, jumped off his porch, and began walking towards Pete followed by another man who was also at the house. Pete became fearful for his life. Pete claimed J.S. reached for Pete's vehicle and opened the driver's door. Because he and J.S. were arguing, and M.D. and the other man were coming towards him, Pete reached under the seat of his vehicle and retrieved a gun. Pete expressed that he thought, "it was either me or him[,]" and he began firing the gun. Pete did not aim at anyone or anything, he just shot in the direction of M.D. first and then J.S. According to Pete, he felt his actions were immediately necessary to protect himself.

Pete's wife, O.P., testified to her observations at Fuel Depot. O.P. recalled C.C. coming in the store twice, then sitting in her car outside the store as Pete drove up and exited his car. Pete and C.C. then began arguing. O.P. went outside; she said C.C. claimed Pete told her husband he would take care of her and pay her bills. Pete's wife indicated the argument escalated to C.C. threatening Pete and his family. O.P. testified that later, another woman came into Fuel Depot looking for Pete and told O.P. "we" knew where her kids attended school, threatened the family, and told her that they had already gotten her house. O.P. learned soon thereafter her house had been vandalized.

Pete's former mother-in-law testified that on the day J.S. got shot, Pete called her upset and asked her to contact C.C.'s mother to tell C.C.'s family to leave him alone. After speaking with C.C., Pete's former mother-in-law spoke with Pete again and suggested Pete leave the matter alone. In another call, Pete insisted she tell C.C.'s family to leave him alone and claimed that in addition to J.S. and M.D. threatening him, J.S. and M.D. went to the Fuel Depot and threatened his wife. Pete told his former mother-in law he would not allow them to do this. Pete also claimed M.D. had a gun when he threatened him. Then, according to Pete's former mother-in-law, Pete called her back and told her if they continued to bother his wife and his family, he was "going to shoot them."

During closing arguments, Pete's counsel acknowledged Pete shot J.S., but emphasized Pete feared for his life and claimed he tried to elicit help from his former mother-in-law to disarm the situation. When it did not work and after Pete tried to discuss the matter with J.S., Pete felt it necessary to shoot to save his own life. The State urged the jury to believe C.C.'s and J.S.'s versions of the events and find Pete guilty of the offense. The State asserted if all the threats against Pete and his family were true, Pete should have contacted the police rather than take matters into his own hands. The State rejected Pete's claim he shot J.S. out of necessity. The jury

did as well and found Pete guilty of aggravated assault, sentencing him to thirty years in prison.

## Standard of Review for the Admission of Evidence

Both of Pete's issues on appeal concern the trial court's admission of evidence. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *See Bowley v. State*, 310 S.W.3d 431, 434 (Tex. Crim. App. 2010). We will not reverse the trial court's ruling unless the record demonstrates a clear abuse of discretion. *See Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003). A trial court abuses its discretion when the court's decision was so clearly wrong as to lie outside the zone within which reasonable persons may disagree. *Id.*

## Admission of Lay Opinion Testimony

In Pete's first issue, he asserts the trial court erred by admitting a witness's impression of what Pete meant by a statement allegedly made to her during an argument. According to Pete, C.C.'s testimony about Pete's statement amounted to inadmissible speculation.

C.C. described her argument with Pete, stating that before Pete drove off in his car, he told her "[h]e had something for [her.]" The State asked C.C. what she thought that statement meant. Defense counsel objected, claiming it called for speculation, but the trial court overruled the objection and said C.C. would be

7

allowed to explain "specifically what she thought that meant to her." C.C. stated she understood it to be "a bad thing in [her] eyes[,]" that "he was going to get something for [her], something to take care of [her,]" but she could not say specifically what he meant. The State tailored the question so the answer was limited to what Pete's statement meant to her. C.C. affirmed she felt threatened by Pete.

Texas Rules of Evidence 602 and 701 apply when a party objects claiming the testimony is speculative. *See* Tex. R. Evid. 602, 701; *Solomon v. State*, 49 S.W.3d 356, 364–65 (Tex. Crim. App. 2001); *Turro v. State*, 950 S.W.2d 390, 403 (Tex. App.—Fort Worth 1997, pet. ref'd). Rule 602 requires that a witness have personal knowledge of the matter on which he or she is testifying. Tex. R. Evid. 602. Rule 701 concerns lay witness opinion testimony. Tex. R. Evid. 701. Rule 701 allows lay witnesses to express opinions when the opinion is based on the witness's perception and is helpful to the jury's understanding of the witness's testimony or to the jury's determination of a fact at issue in the case. *See* Tex. R. Evid. 701; *Osbourn v. State*, 92 S.W.3d 531, 535 (Tex. Crim. App. 2002).

The first prong of Rule 701 requires a witness rationally base his or her testimony on what he or she perceives. *See* Tex. R. Evid. 602, 701; *Solomon*, 49 S.W.3d at 364–65; *Fairow v. State*, 943 S.W.2d 895, 897 (Tex. Crim. App. 1997). The personal knowledge of the events which forms the basis of the witness's opinion

may come directly from what the witness sees, hears, or smells, or otherwise from the witness's experience. *Osbourn*, 92 S.W.3d at 535; *Fairow*, 943 S.W.2d at 898. An opinion is rationally based on a witness's perception if the opinion is one a reasonable person could have drawn under the circumstances. *Fairow*, 943 S.W.2d at 900. The second prong of Rule 701 requires the witness's opinion be helpful to the trier of fact. *See* Tex. R. Evid. 602, 701; *Solomon*, 49 S.W.3d at 364–65. There is no "bright line" test indicating when an opinion is helpful. *Fairow,* 943 S.W.2d at 900. "This consideration is especially prudent when the opinion concerns culpable mental state." *Id.*

Initially, we conclude the State established the predicate that C.C. had personal knowledge of the events upon which her testimony was based. *See id.* at 898–99; *see also* Tex. R. Evid. 701. She participated in the conversation with Pete to which she testified. *See Fairow*, 943 S.W.2d at 898. Specifically, regarding whether a reasonable person could draw the same conclusion as C.C.—that Pete's statements were perceived by C.C. as threatening—C.C. described a heated argument with Pete. According to C.C., the argument began when Pete expressed she should not be dating or be involved with anyone romantically while her husband, Pete's friend, was incarcerated. C.C. stated the argument escalated to a point they both stepped out of their cars arguing until Pete's wife came outside the store and

9

told Pete to leave, at which time, he made the statement that C.C. interpreted as a threat. As a result, through what she perceived, C.C. could testify regarding what she believed Pete meant by the statement. *See* Tex. R. Evid. 602, 701; *Solomon*, 49 S.W.3d at 364; *Fairow*, 943 S.W.2d at 898–99. Moreover, a reasonable person could form the opinion C.C. expressed about the meaning of Pete's statement to her. *See Fairow*, 943 S.W.2d at 900.

Next, under Rule 701, the witness's testimony must be helpful to the jury. *Solomon*, 49 S.W.3d at 364. Testimony is helpful when it either assists the jury to understand the witness's testimony or to understand a fact issue. *Fairow*, 943 S.W.2d at 900. The decision regarding admissibility is committed to the sound discretion of the trial court. *Id.* at 901. It is likely the trial court found C.C.'s perception of Pete's statement helpful in assisting the jury to understand C.C.'s testimony. *See Osbourn*, 92 S.W.3d at 535 (explaining that a witness's testimony can include opinions, beliefs, or inferences if they are drawn from his or her own experiences or observations). The trial court did not abuse its discretion by allowing C.C.'s opinion testimony. We overrule Pete's first issue.

**Admission of Underlying Facts of Prior Convictions**

Pete argues in his second issue the trial court erred by allowing the State to cross-examine him about the underlying facts of his prior convictions for arson and

drug possession. Pete testified at trial. When explaining why he should not have had a gun, Pete's counsel asked him about being a convicted felon. Pete then stated he pled guilty to arson and drug possession charges and served time for those offenses. In addition, defense counsel asked Pete whether his prior convictions were crimes of violence, to which Pete responded, "No[.]"

The State then cross-examined Pete and asked several questions about the details of the crimes underlying each conviction. Pete explained the arson conviction arose after a man stole his ex-wife's purse from inside their car. In response, Pete and another person burned the thief's car. When asked whether Pete considered that reaction not to be an act of violence, Pete responded that "nobody got hurt. The car got burned." Next, the State inquired as to Pete's drug charge, which Pete said was a federal charge for possession of cocaine. Pete also admitted he both used and sold cocaine before his conviction. When the State asked how long he sold drugs, defense counsel objected claiming the information the State sought was outside the scope of Texas Rules of Evidence Rule 609. The trial court overruled the objection. The State then asked Pete further details of each conviction and specifically, why he did not contact the police when his ex-wife's purse was stolen instead of taking matters into his own hands.

11

Pete contends on appeal the trial court erred by allowing the State to elicit details of his prior felony offenses because the evidence was not elicited to question Pete's credibility, but rather to convict him based on the extraneous conduct itself. The State referenced the arson charge in its closing argument to draw the comparison in that case to Pete's decision here to not contact the police for assistance because of the alleged threats against his family but rather take matters into his own hands and retaliate.

Rule of Evidence 609 permits the admission of evidence of the fact of a prior felony conviction offered to attack a witness's character for truthfulness. Tex. R. Evid. 609(a). However, the details of the prior conviction are generally inadmissible for purposes of impeachment. *Mays v. State*, 726 S.W.2d 937, 953 (Tex. Crim. App. 1986); *Arebalo v. State*, 143 S.W.3d 402, 407 (Tex. App.—Austin 2004, pet. ref'd). "This is because evidence of prior convictions and extraneous bad acts 'is inherently prejudicial, tends to confuse the issues in the case, and forces the accused to defend himself against charges which he had not been notified would be brought against him.'" *Arebalo*, 143 S.W.3d at 407 (quoting *Albrecht v. State*, 486 S.W.2d 97, 100 (Tex. Crim. App. 1972)).

Error in the admission of evidence is non-constitutional error subject to a harm analysis under Texas Rule of Appellate Procedure 44.2(b). *Jabari v. State*, 273

S.W.3d 745, 754 (Tex. App.—Houston [1st Dist.] 2008, no pet.); *see also* Tex. R. App. P. 44.2(b). We disregard any non-constitutional error that does not affect the defendant's substantial rights. Tex. R. App. P. 44.2(b); *Jabari*, 273 S.W.3d at 754. "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Jabari*, 273 S.W.3d at 754 (citing *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000)). We will not overturn a conviction for non-constitutional error if the court, after examining the record as a whole, has fair assurance that the error did not influence the jury or had but slight effect. *Id.* (citing *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998)). "The improper admission of evidence does not constitute reversible error if other properly admitted testimony proves the same facts." *Id.*

Several witnesses testified Pete initiated an argument with C.C. that escalated. Pete's ex-mother-in-law explained that while Pete contacted her several times and expressed he was both fearful and angry after receiving the alleged threats against him and his family, Pete told her he would shoot them if he or his family were threatened. It is undisputed Pete shot J.S.; the case hinged on whether Pete felt he had to shoot J.S. out of necessity, which was dependent upon which version of events the jury believed leading to Pete being present at M.D.'s house when the shooting occurred.

13

Based on the record as a whole, while Pete provided brief testimony about the details of his prior convictions, which included several details that were undisputedly not objected to, the State presented strong evidence of the charged offense. We conclude the trial court's error in allowing the State to elicit details of Pete's prior convictions did not have a substantial or injurious effect in determining the jury's verdict and did not affect Pete's substantial rights. *See* Tex. R. App. P. 44.2(b); *Jabari*, 273 S.W.3d at 754 (holding that trial court's error in allowing details of defendant's prior convictions was harmless because "[a]mple other evidence existed on which the jury could have found [defendant] guilty"). We overrule Pete's second issue and affirm the trial court's judgment.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on April 6, 2018
Opinion Delivered September 26, 2018
Do Not Publish

Before McKeithen, C.J., Kreger and Johnson, JJ.

14