Servando **PACHECANO, Jr.**, Appellant,

v.

The **STATE** of Texas, State.

No. 2–92–456–CR.

Court of Appeals of Texas,
Fort Worth.

July 26, 1994.

---

Ward Casey, Fort Worth, for appellant.

Betty Marshall, Fort Worth, for appellee.

Before HILL, C.J., and LATTIMORE and FARRAR, JJ.

## OPINION

LATTIMORE, Justice.

Servando Pachecano, Jr. was convicted of murder and sentenced to life in prison. He raises ten points of error in this appeal. We affirm the trial court's judgment.

C.T., a forty-one year-old wife and mother of four, and Y.M., a twenty-three year-old mother of one, were coworkers at an optical store in Fort Worth. In the early evening of November 27, 1990, C.T. and Y.M. were preparing to close the store and leave for the day. Y.M. noticed two men, appellant and David Hernandez, appellant's cousin, walk past the front of the store. When they walked by a second time and started to enter the store, Y.M., who had already brought her purse to the front of the store, started toward the back of the store. As she began walking to the back of the store, appellant followed her and put a gun to her head.

Appellant told Y.M. to give them all the money that she and C.T. had. Y.M. complied. Appellant and Hernandez also emptied the store's cash register. While appellant next took Y.M. outside to her car and had her get into the driver's seat, Hernandez locked C.T. in the optical store's restroom. When Hernandez came out alone, appellant told him to go back in and get C.T. because she could call the police. Hernandez got C.T., and all four of them left in Y.M.'s car with Y.M. driving, Hernandez in the front passenger seat, and appellant and C.T. in the back seat.

Appellant made C.T. partially disrobe and began fondling her. C.T. responded by slapping appellant. Appellant then decided to drive, with C.T., who had put her blouse back on, in the front seat with him and Y.M. and Hernandez in the back seat. Hernandez made Y.M. disrobe and raped her in the back seat. Appellant drove by a K–Mart, but a police officer was there, so he did not stop.

He next went into a nearby store, but it did not have what he was looking for. He then drove to another K–Mart, where he bought two rolls of duct tape and some rope.

After buying the tape and rope, appellant drove to an isolated area in Fort Worth where there was an abandoned warehouse. Appellant and C.T. got out of the car and went into the building. While they were gone, Hernandez raped Y.M. again in her car. Thirty minutes later, appellant reappeared, wiping his knife on his pants. C.T. was not with him. Appellant and Hernandez whispered to each other for a few minutes, and then appellant said in front of Y.M., "[L]et's hurry up and leave, because she's tied up. She can get loose."

Appellant and Hernandez then left with Y.M., bought some beer, and spent the night at a motel. Throughout the night they separately raped Y.M., and they also raped her at the same time. The next day they drove to Hood County, broke into a mobile home where Hernandez' mother and stepfather lived, took sleeping bags and food in case the police were looking for them, and switched the license plates on Y.M.'s car.

Appellant and Hernandez, holding Y.M. captive, spent the rest of the day driving around the area near the mobile home park, drinking beer, and smoking marijuana. They also tried but were unable to steal a motor home. They next returned to the mobile home park where Hernandez' stepfather told them to leave and called the police. Appellant, Hernandez, and Y.M., who was still held captive, ran into the woods to hide. When it was dark, appellant's two sisters, whom he had called, picked them up and drove them all back to Fort Worth. At Hernandez's command, Y.M. pretended she was his girlfriend during the drive back.

Once in Fort Worth, Y.M. was let out at a gas station, where she called her boyfriend to come and get her. After a rape examination at a hospital, Y.M. went to the police department to give a statement on the morning of November 29th. It was then that she learned that C.T. had been found dead.

C.T.'s body was found shortly before midnight on November 28th. Her body was wrapped in a piece of carpeting and was covered by a black tarp. She was naked. Her ankles and knees were bound by duct tape, and her hands were bound behind her back with duct tape. A piece of cloth serving as a gag was in her mouth. Her head was encircled with duct tape, and then her pants had been wrapped and tied around her head as well. Her autopsy revealed that she died of suffocation.

Appellant was indicted for capital murder. His indictment alleged that on or about the 27th of November 1990, he did

> THEN AND THERE INTENTIONALLY CAUSE THE DEATH OF AN INDIVIDUAL, [C.T.], BY SUFFOCATING HER BY PLACING A CLOTH IN HER MOUTH *AND* BY COVERING AND CLOSING HER ORAL AND NASAL OPENINGS WITH TAPE *AND* BY WRAPPING A CLOTH LIGATURE OVER THE SAID TAPE, AND THE SAID [APPELLANT] WAS THEN AND THERE IN THE COURSE OF COMMITTING AND ATTEMPTING TO COMMIT THE OFFENSE OF KIDNAPPING, OF [C.T.],
>
> PARAGRAPH TWO: ... [APPELLANT] ... ON OR ABOUT THE 27TH DAY OF NOVEMBER, 1990, DID THEN AND THERE INTENTIONALLY CAUSE THE DEATH OF AN INDIVIDUAL, [C.T.], BY SUFFOCATING HER BY PLACING A CLOTH IN HER MOUTH *AND* BY COVERING AND CLOSING HER ORAL AND NASAL OPENINGS WITH TAPE *AND* BY WRAPPING A CLOTH LIGATURE OVER THE SAID TAPE, AND THE SAID [APPELLANT] WAS THEN AND THERE IN THE COURSE OF COMMITTING AND ATTEMPTING TO COMMIT THE OFFENSE OF ROBBERY, OF [C.T.], ...
> [Emphasis added.]

The jury charge first instructed on capital murder and then on the lesser-included offense of murder, as follows:

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 27th day of November, 1990, in Tarrant County, Texas, the Defendant, Servando Pachecano, Jr., knowingly caused

the death of an individual, [C.T.], by suffocating her by placing cloth in her mouth and by covering and closing her oral and nasal openings with tape and by wrapping a cloth ligature over the said tape, *OR* the Defendant, Servando Pachecano, Jr., while in the course of committing a felony, to wit: kidnapping or robbery of [C.T.], and in the course of and in furtherance of the commission or attempt, or in the immediate flight from the commission or attempt, committed or attempted to commit an act clearly dangerous to human life that caused the death of [C.T.], then you will find the Defendant guilty of murder. [Emphasis added.]

The jury returned a general verdict of guilty to murder.

■ In his first point of error, appellant contends that the evidence is insufficient because the State had to prove that he suffocated C.T. by all three means—the cloth, the tape, and the ligature—and there is no evidence that the tape covered and closed her nasal openings. In other words, appellant contends that the "jury was required to find that suffocation was caused by each and every manner and means alleged in the indictment."

We need not address appellant's insufficiency of the evidence complaint, however. The State did not have to prove that appellant suffocated C.T. by all three means. The State presented the jury with two separate murder theories: either murder: appellant suffocated C.T. with cloth, tape, and ligature (Tex.Penal Code Ann. § 19.02(a)(1) (Vernon 1989)); or felony murder: appellant committed an act clearly dangerous to human life that caused her death. *Id.* § 19.02(a)(3). The jury's general verdict was proper, *Aguirre v. State,* 732 S.W.2d 320, 325–26 (Tex.Crim.App.1987) (op. on reh'g), and could have been based on either murder theory. *Gunter v. State,* 858 S.W.2d 430, 439 (Tex. Crim.App.), *cert. denied,* — U.S. —, 114 S.Ct. 318, 126 L.Ed.2d 265 (1993).

Under the felony murder theory, no specific manner and means was alleged; only "an act clearly dangerous to human life" was alleged. Appellant does not contend that there was insufficient evidence that he committed an act clearly dangerous to human life. He does not challenge suffocation by just cloth and ligature at all. Because there is no challenge to the sufficiency of the evidence supporting the felony murder theory, we overrule appellant's first point of error.

■ In his second point of error, appellant contends that the trial court erred in denying his motion for instructed verdict of not guilty to capital murder because the evidence was insufficient to support a capital murder verdict. Appellant claims that the trial court's denial contributed to his murder conviction and life sentence.

■ In reviewing the sufficiency of the evidence to support a conviction, the evidence is viewed in the light most favorable to the verdict. *Flournoy v. State,* 668 S.W.2d 380, 383 (Tex.Crim.App.1984). The critical inquiry is whether, after so viewing the evidence, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Bonham v. State,* 680 S.W.2d 815, 819 (Tex.Crim.App.1984), *cert. denied,* 474 U.S. 865, 106 S.Ct. 184, 88 L.Ed.2d 153 (1985). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979). The standard of review is the same for direct and circumstantial evidence cases. *Geesa v. State,* 820 S.W.2d 154, 158–62 (Tex.Crim.App.1991).

Appellant's defense was that he was only guilty of murder, not capital murder. This defense became apparent during voir dire and opening statement. The focus of the State's case and appellant's defense thus was whether appellant had specific intent to kill. The following evidence warranted denial of appellant's motion for instructed verdict:

● Appellant kidnapped C.T. so she could not call the police.

● C.T. was bound at the hands, knees, and ankles.

● C.T. was suffocated by cloth in the mouth, tape covering her mouth and most

of her nostrils, and a ligature around her head.

● C.T.'s struggling and gagging would have been apparent to anyone with her.

● C.T. probably lost consciousness within three to five minutes of gagging on the cloth and probably died within five to ten minutes of losing consciousness.

● C.T.'s body was dragged at or near the time of her death to the rear part of the abandoned building.

● C.T.'s body was covered with carpet and a tarp.

● Appellant threatened Y.M.'s life.

● Appellant threatened Y.M. with a gun.

● Appellant and Hernandez threatened Y.M. and her child, telling her that they knew where she lived.

Appellant's evidence that he had no intent to kill was (1) Y.M. said appellant told Hernandez: "[L]et's hurry up and leave, because she's tied up. She can get loose;" and (2) the tape did not cover C.T.'s nose.

From this evidence, a rational jury could have concluded that appellant killed C.T. and hid her body to avoid detection and that her death was his conscious objective or desire as she gagged and died during the thirty minutes he was with her in the abandoned building. *See, e.g., Creel v. State,* 754 S.W.2d 205, 210–13 (Tex.Crim.App.1988); *Smith v. State,* 822 S.W.2d 761, 763 (Tex.App.—Fort Worth 1992, pet. ref'd). The trial court did not err in denying appellant's motion for instructed verdict on the capital murder charge. We overrule appellant's second point of error.

In his third point of error, appellant contends that the trial court's refusal to instruct a not guilty verdict to capital murder coerced his counsel to urge a conviction of murder, thereby depriving appellant of effective assistance of counsel. This point of error is premised on alleged error by the trial court in refusing to grant appellant's motion for instructed verdict on capital murder. Because we held above that the trial court did not err in that respect, we necessarily overrule appellant's third point of error. Moreover, appellant's counsel urged that appellant was guilty of only murder through voir dire, opening statement, and the presentation of

the evidence *before* his motion for instructed verdict was made and denied.

In his fourth and fifth points of error, appellant argues that because the State failed to preserve potentially exculpatory photographs taken during C.T.'s autopsy, the trial court erred by not striking part of the medical examiner's testimony and by refusing appellant's requested jury instruction on spoliation. We address these two points in reverse order.

■■■ The duty to preserve evidence is limited to evidence that possesses an exculpatory value that was apparent before the evidence was destroyed. *Hebert v. State,* 836 S.W.2d 252, 253 (Tex.App.—Houston [1st Dist.] 1992, pet. ref'd). A criminal defendant must show bad faith to establish that failure to preserve potentially useful evidence constitutes a denial of due process. *Id.* at 254. Further, to establish a due process claim, a defendant must make some showing that the lost evidence was favorable and material. *Id.* Merely showing that the lost evidence *"might have been"* favorable does not establish materiality. *Id.*

■■■ The indictment alleged that appellant suffocated C.T. in part by "covering and closing her oral and nasal openings with tape." Dr. Nizam Peerwani, the Tarrant County Medical Examiner, performed C.T.'s autopsy. Dr. Peerwani's autopsy report states that suffocation was due, in part, to "[d]uct tape occluding the oral and nasal openings and encircling the face." His preliminary autopsy report made the identical statement.

At a pretrial hearing, Dr. Peerwani said that he and an assistant took photographs as he performed C.T.'s autopsy. There were no photographs of the tape on C.T.'s nose. Dr. Peerwani explained that a few photographs had not come out and suggested that those taken of the tape on C.T.'s nose were among them.

At trial, Dr. Peerwani testified that the tape partially covered C.T.'s nose. He repeated that the photographs of the tape on C.T.'s nose did not turn out. The photographs were taken; they just did not turn

out. No photographs using an instant camera such as a Polaroid were taken.

At the close of Dr. Peerwani's testimony, appellant moved to strike his testimony concerning the duct tape covering C.T.'s nose on due process grounds, *see Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), on the grounds that the State failed to preserve photographs of the tape on C.T.'s face and such evidence is exculpatory and refutes the allegations in the indictment. Appellant also moved to dismiss for failure to preserve exculpatory evidence on the same grounds. The trial court denied both motions.

The trial court did not err. First, appellant makes no showing that photographs of tape on or under C.T.'s nose ever existed, and their existence was denied by Dr. Peerwani. Because there were no photographs, they could not have been destroyed or preserved. The trial court properly refused a jury instruction on spoliation of evidence. We overrule appellant's fifth point of error.

■ Second, appellant has not shown that such photographs, if they existed, were material. A photograph would have, at most, cast doubt on Dr. Peerwani's testimony that the tape partially covered C.T.'s nose. This is not enough to establish materiality. *Hebert,* 836 S.W.2d at 254. Instead, the loss or destruction of evidence must be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means and, as a result, be significantly prejudiced at trial. *Saldana v. State,* 783 S.W.2d 22, 23 (Tex.App.—Austin 1990, no pet.); *Cuesta v. State,* 763 S.W.2d 547, 555 (Tex.App.—Amarillo 1988, no pet.).

Here, appellant had other comparable evidence. Dr. Robert Bux, Deputy Medical Examiner in Bexar County, Texas, appellant's expert, testified that the tape was under C.T.'s nose, not on it. Also, Dr. Peerwani made a sketch appearing to indicate that the tape was under C.T.'s nostrils.

Finally, appellant cannot show prejudice. The jury apparently agreed with his defense that he had no specific intent to kill because he left at least part of C.T.'s nostrils uncovered so she could breathe.

Based on the discussion above, we need not address appellant's contention of bad faith. We overrule appellant's fourth point of error.

■ In appellant's sixth point of error, he complains that the trial court erred by failing to strike Y.M.'s testimony relating to statements made by appellant reflecting his specific intent to kill because the State failed to disclose those statements. Appellant had previously filed a motion for discovery that sought a summary of all oral statements made in Y.M.'s presence expressing an intent to kill her or C.T. The trial court denied the motion, apparently based on the State's explanation that it had an "open file" on appellant's case.

At trial Y.M. testified that at one point appellant stated "[h]e wanted to tie me up to a rock and throw me down the river, and he wanted to let go of the car and tie me up and let the car go down [the boat ramp to] the lake." Appellant did not timely object to this testimony. By not objecting at the earliest opportunity, appellant failed to preserve any error for appellate review. TEX.R.CRIM.EVID. 103(a)(1); *Strong v. State,* 805 S.W.2d 478, 487 (Tex.App.—Tyler 1990, pet. ref'd). Point of error six is overruled.

■ In his seventh point of error, appellant alleges that the State persuaded the trial court to deny discovery by falsely representing that it had disclosed information through its open file policy. This point is apparently directed at Y.M.'s testimony that was the subject of our discussion of point of error six.

■ The due process clause of the Fourteenth Amendment is violated when a prosecutor (1) fails to disclose evidence (2) that is favorable to the accused (3) and that creates a probability sufficient to undermine the confidence in the outcome of the proceeding. *Ex parte Mitchell,* 853 S.W.2d 1, 4 (Tex. Crim.App.), *cert. denied,* — U.S. —, 114 S.Ct. 183, 126 L.Ed.2d 142 (1993); *Thomas v. State,* 841 S.W.2d 399, 404 (Tex.Crim.App. 1992).

The State announced on December 6, 1991, long before trial, which began in October 1992, that it would have an open file policy in

this case. The files were open from December 1991 to January 1992, and appellant's original counsel viewed the entire file. After new counsel were appointed, the files were open from March 16, 1992 until May 1, 1992. In addition, appellant's new counsel already had a complete copy of the files given to appellant's original counsel. The State's file was again open for another three days beginning on August 31, 1992.

On September 3, 1992, the State tendered to appellant a police officer's handwritten report of Y.M.'s oral statements to him in which she stated that both appellant and Hernandez had threatened her life numerous times. One of appellant's attorneys agreed that he had seen the report but had "missed" any threats, and appellant's other attorney saw the report along with Y.M.'s sworn statement and was aware that the report contained several references to threats by both appellant and Hernandez.

On October 2, 1992, the State informed appellant's counsel orally and in writing about one of these specific threats—that appellant had threatened Y.M.'s life while they were on a dirt road in Hood County and that Hernandez had talked appellant out of killing her. This information had been given to appellant's original counsel on January 15, 1992. At trial Y.M. did not testify about this threat.

■■■ The record sufficiently establishes the State had an open file policy in this case, followed that policy, and disclosed to appellant's counsel that Y.M. had made oral statements about appellant's threats to her. Appellant's real complaint is that the State did not disclose all of the particular details of each of the threats appellant allegedly made.

■■■ First, appellant has not shown that the particular details of the threats at issue were known by the State before trial. *See Hafdahl v. State*, 805 S.W.2d 396, 399 n. 3 (Tex.Crim.App.1990) (prosecutors under no duty to disclose information not known to exist), *cert. denied*, 500 U.S. 948, 111 S.Ct. 2250, 114 L.Ed.2d 491 (1991). There is no constitutional requirement that the State make a complete and detailed accounting to the defense of all investigatory work on a

case unless the omission is sufficiently significant to result in denying the defendant's right to a fair trial. *Ransonette v. State*, 550 S.W.2d 36, 40 (Tex.Crim.App.1976). Neither the details nor the whole statement were exculpatory to appellant or impeaching to Y.M. *Cf. Jannise v. State*, 789 S.W.2d 623, 629 (Tex.App.—Beaumont 1990, pet. ref'd) (statement should be disclosed if beneficial to defendant or goes to credibility of witness). In this case, the statement was wholly inculpatory and consistent with Y.M.'s other statements.

Next, we consider the statement's materiality. It was only one of many threats undoubtedly disclosed and testified to. Appellant's counsel fully crossexamined Y.M. about her statements. Finally, the statement had no effect on the outcome. The jury, by not convicting appellant of capital murder, found that appellant lacked specific intent when he murdered C.T. *See Crane v. State*, 786 S.W.2d 338, 349 (Tex.Crim.App.1990). We thus overrule appellant's seventh point of error.

■■■ In his eighth point of error, appellant contends that the trial court erred in admitting his pen packet because it facially indicated a lack of trustworthiness.

Appellant's indictment alleged a December 1984 burglary of a habitation conviction in an enhancement paragraph. He pleaded not true. The State then presented Deputy Joe Patton of the Tarrant County Sheriff's Department, a fingerprint expert, who testified that he had just taken appellant's fingerprints. These fingerprints were admitted into evidence. He further testified that those fingerprints matched a previously admitted set of appellant's fingerprints and a set of fingerprints in appellant's pen packet.

Appellant did not object to Deputy Patton's testimony, but he objected to the admission of his pen packet on the grounds it was not properly authenticated and it lacked trustworthiness as a public record. Appellant argued that the pen packet was not trustworthy because "the person taking the prints did not copy them, they're Xerox copies, and there's no showing that S.O. Woods [the prison records clerk] or anybody

else ever compared these Xerox copies with the original prints." The trial court overruled the objections and admitted the pen packet.

On appeal appellant only complains about the trustworthiness of the fingerprints in the pen packet. He claims that the pen packet lacks trustworthiness under TEX.R.CRIM. EVID. 803(8) because: (1) the fingerprint cards were copies; (2) the fingerprint cards did not contain the signature of the person who took the prints; (3) there is no showing of who copied the cards; and (4) there is no showing the records clerk knew how to compare the copies to the originals. In support of his claim that the pen packet and the print cards in it lack trustworthiness, appellant cites *Ruiz v. Estelle,* 503 F.Supp. 1265, 1296 (S.D.Tex.1980), which found that some inmates had been able to use information from other inmates' files for improper purposes. We agree with the State that *Ruiz* wholly fails to support appellant's claim; that opinion states nothing about pen packets, much less anything about pen packets at the time appellant was imprisoned for his 1984 conviction.

We also agree with the State that the fingerprint cards were not deficient. The fact that the cards were copies does not render them inadmissible. Copies of public records are admissible in place of the originals when the copies are certified in accordance with Rule 902. TEX.R.CRIM.EVID. 1005; *Reed v. State,* 811 S.W.2d 582, 585 n. 11 (Tex.Crim.App.1991); *Gonzales v. State,* 831 S.W.2d 491, 493 (Tex.App.—Houston [14th Dist.] 1992, pet. ref'd). Here, appellant does not complain of authenticity of the pen packet, which is certified. With no challenge to the pen packet's authenticity, the State did not have to show who took appellant's fingerprints, who copied the fingerprint cards, or that the records clerk knew how to compare copies to originals. There is no requirement that a record custodian explain the method of obtaining the records. *Love v. State,* 730 S.W.2d 385, 397 (Tex.App.—Fort Worth 1987, no pet.).

■ Finally, even if the copies of the fingerprint cards were deficient, the entire pen packet would not be inadmissible. Any deficiencies would go only to its weight. *Robinson v. State,* 739 S.W.2d 795, 802 (Tex. Crim.App.1987). The rest of the pen packet identifies appellant as the person convicted of the 1984 burglary. The jury could have compared his photograph in the pen packet with his appearance in the courtroom and could have compared his signature in the pen packet with his signatures on the other two sets of his fingerprints. *See Littles v. State,* 726 S.W.2d 26, 30–32 (Tex.Crim.App.1984) (op. on reh'g). We overrule appellant's eighth point of error.

After the jury found appellant guilty of murder, in the punishment phase of the trial, the jury was instructed:

A deadly weapon means anything that in the manner of its use is capable of causing death or serious bodily injury.

Serious bodily injury means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

The jury gave an affirmative answer to the following question:

Do you find beyond a reasonable doubt that the Defendant, Servando Pachecano, Jr., used a deadly weapon, to wit: cloth and tape during the commission of the offense?

■ In his ninth point of error, appellant attacks the jury's affirmative deadly weapon finding, contending that the definition of deadly weapon is unconstitutionally vague as applied to him. Appellant offers no authority or argument other than to quote his trial objection to the effect that in a murder case, a deadly weapon finding "serves no purpose." We overrule this point of error as inadequately briefed because appellant does not cite any authority, thus resulting in waiver. *See* TEX.R.APP.P. 74(f); *State v. Gonzales,* 855 S.W.2d 692, 697 (Tex.Crim.App.1993); *see also Parent v. State,* 621 S.W.2d 796, 797 (Tex.Crim.App. [Panel Op.] 1981) (defendant has burden to show operation of statute was unconstitutional as applied to him).

In his tenth and final point of error, appellant further attacks the jury's affirmative deadly weapon finding, contending that it doubly enhanced his sentence and constitutes double jeopardy. Appellant first argues that the affirmative finding violates the double jeopardy clause because the same act that elevated his felony of kidnapping or robbery to murder adversely affects his parole eligibility.

The jury returned a general guilty verdict of murder, which was proper. *Aguirre,* 732 S.W.2d at 325–26. The jury either found appellant guilty of murder or felony murder; either they found he killed C.T. with cloth, tape, and ligature or he committed an act clearly dangerous to human life that caused C.T.'s death while in the course of committing the kidnapping or robbery of C.T. Because the jury may not have based its verdict on felony murder, the same act did not necessarily both elevate his kidnapping or robbery offenses to murder and adversely affect his parole eligibility.

In any event, even if the jury found appellant guilty of felony murder, his complaint lacks merit because the affirmative finding is not an enhancement of punishment. An enhancement provision allows the trial court to admit evidence of a defendant's prior convictions for assessment of punishment. TEX. CODE CRIM.PROC.ANN. art. 37.07, § 3(a) (Vernon Supp.1994). An affirmative deadly weapon finding, however, does not affect the assessment of punishment; it only affects the amount of the assessed sentence that must be served. *See* TEX.CODE CRIM.PROC.ANN. art. 42.18, § 8(b)(3) (Vernon Supp.1994). The double enhancement cases relied on by appellant, *Simpson v. United States,* 435 U.S. 6, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978) and *McWilliams v. State,* 782 S.W.2d 871 (Tex. Crim.App.1990), are thus inapposite. The affirmative deadly weapon finding does not increase or double appellant's sentence, therefore no double jeopardy occurred. We overrule appellant's tenth point of error.

The trial court's judgment is affirmed.