Opinion Issued November 20, 2008









Opinion Issued November
20, 2008                                                                        

 

 

 

 

 

 

 

 

 

 

 

 

 

 










 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NO. 01-07-00922-CR

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



FARUQ KWAME JABARI, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 

 



On Appeal from the 262nd District Court

Harris County, Texas

Trial Court Cause No. 1129352








 



O P I N I O N

           A jury convicted Faruq
Kwame Jabari, also known as Howard or Harry Johnson, of aggravated sexual
assault, and sentenced him to confinement for life in prison.  Jabari appeals his
conviction, contending in five issues that: (1) the trial court abused its
discretion by allowing evidence of extraneous offenses during the
guilt/innocence phase of the trial; (2) he was denied his due process right to
a fair and impartial jury and his right to confront the witnesses against him
when the jury witnessed an outburst in Spanish by the complaining witness; (3)
he was denied due process because the prosecution withheld material and
exculpatory evidence from defense counsel in violation of the duty owed under Brady
v. Maryland[1];
(4) the cumulative effect of the DNA evidence against him did not cure the harm
caused by the trial court’s errors and the denials of his constitutional
rights; and (5) the trial court abused its discretion by not conducting a
hearing on his motion for new trial.

Background

Beatrice Conde, a seventeen-year-old
recent immigrant from Mexico,  testified that, on February 16, 2006, she lived
in the predominantly Hispanic Villa de Matel apartment complex in south Houston with her boyfriend Enrique Lopez.  Conde had been living in the apartment for about
three weeks, having previously lived with her father.  At about 1:30 that
afternoon, Conde was home alone in the apartment while Lopez was at work. 
Something on the stove began to burn, and Conde opened the door of the
apartment to let out the smoke.  At this time, an unfamiliar black man wearing
a visor and glasses, walked by the open apartment door and attempted to begin a
conversation with Conde.  He asked if she spoke English, and spoke to her in
English and broken Spanish.  The man asked if she would make him something to
eat, and she agreed to make him a sandwich.  The man left, saying he would return
in a few minutes, and Conde partially closed the door and went to make the
sandwich.  About five minutes later, the man returned, and Conde told him the
sandwich was ready.  He came inside Conde’s apartment without being invited and
closed the door behind him.  He sat down and took a bite of the sandwich, and
Conde went to open the door again.  When she got to the door, the man grabbed
her by the hair, pulled out a small, squared-off, silver firearm, and took her
to the bedroom.  Conde began to scream, and the man threw her on the bed and
put a pillow over her face.  Conde stopped screaming, and the man removed the
pillow and told her to take off her pants.  He pulled down his own pants, put
on two condoms, held the pistol to Conde’s temple and raped her.  He pulled up
his pants, leaving the two condoms on, and told her not to either leave the bedroom
until he left or tell anyone about the rape, or he would come back and kill
her.  He then left the apartment. 

As soon as the man left, Conde locked
the door and called Lopez on his cell phone at work.  Lopez reported the rape
to the apartment manager.  The apartment manager called the police.  Conde told
the investigating officer that she had been raped.  

At trial, the prosecutor asked Conde
if she saw her attacker in the courtroom.  Conde initally said no.  The
prosecutor continued questioning Conde until she noticed that Conde kept
looking at someone in the courtroom and asked her who she was looking at. 
Conde began to cry and said she was looking at a man who looked like her
attacker, and she thought that it was him.  She began to describe the clothes
that he was wearing, and said he was wearing a white shirt.  Then she began
screaming and crying and said things in Spanish that were not translated or
recorded.  The bailiff removed the jury from the courtroom until Conde calmed
down.  Jabari’s counsel moved for a mistrial on the basis that Conde’s
untranslated Spanish statements were not testimony but were said in open court
in front of the jury and were prejudicial.  The trial court denied the motion
for mistrial but instructed the jurors to disregard anything that they had
heard that was not in direct response to a question asked.  The prosecutor
continued her direct examination of Conde.  Conde said that when first asked to
identify her attacker, she did not see him in the courtroom because he was
obscured from her view.  She testified that when she saw him, it startled her.  She
identified Jabari as her attacker.  

Officer F. Salazar of the Houston
Police Department arrived at Beatrice Conde’s apartment complex in response to
a call from the apartment manager.  He met the manager at the door to Conde’s
apartment, and the manager took him back to the bedroom, where he saw Conde
lying on the bed in a fetal position.  Conde told Officer Salazar what had
happened, and he collected evidence from the apartment, including the sandwich
from which Conde’s attacker had taken a bite.  He submitted the sandwich for
DNA testing.  Salazar testified that he did not collect a glass from the table
where the sandwich had been.  The DNA profile from the sandwich matched the DNA
profile later taken from Jabari after his arrest.

The State sought to introduce
evidence of extraneous offenses to prove identity.  The trial court allowed the
admission of two such offenses.  Maria Pena testified that she lived in an
apartment complex in south Houston.  At around noon on February 23, 2006, a
week after Conde’s rape, Pena was home alone with her baby when she heard a
knock.  Pena answered the door, thinking it was her sister, but instead it was
a black man wearing glasses, whom she had never seen before.  The man asked her
in broken Spanish if he could borrow a pen, and she pretended not to understand
him.  She tried to close the door, but he pushed it open and came inside.  The
man pulled out a chrome firearm, grabbed her by the neck, and held the gun to
her head.  He pushed Pena into the walk-in closet where her baby was sleeping
in her crib, and Pena fell to the floor.  Pena pleaded with him not to hurt her
or her baby, and he pointed the firearm at the baby, so she decided to
cooperate.  He removed her pants and her panties, put a towel on the floor, and
put on a condom.  The man told her not to look at him, and he raped her.  When
he was finished, the man got up and told Pena not to leave the closet for
fifteen minutes.  After the man left, Pena went to her sister’s apartment, and
her sister called the police.  Pena identified Jabari as the man who raped her
and identified the firearm Jabari had in his possession when he was arrested as
the firearm with which she was attacked.  

Gemina Guadarrama testified that on January
12, 2007, she was home with her young son at the primarily Hispanic Cedar Glen
apartment complex in southwest Houston.  At about 9:00 a.m., she was getting
ready to walk to the supermarket and had put her son in his stroller when there
was a knock on the door.  Guadarrama opened the door, and a black man, wearing
a hat and glasses, stood outside and asked her in broken Spanish for someone
named Carlos.  Guadarrama had a hard time understanding his Spanish, so the man
asked if anyone was home who spoke English.  Guadarrama told him there was no
one else, and the man said he would come back later with someone who could
speak Spanish and left.  As Guadarrama was leaving her apartment for the
supermarket, the man returned and asked her if she had a pencil and paper.  She
left her son in the stroller outside and went a few feet inside the door to get
the pencil and paper.  Then she noticed the man bringing the stroller back
inside the door, and she became concerned.  The man closed the door and grabbed
Guadarrama and pointed a “plated” firearm at her.  The man told her he wanted
money, and she gave him ten dollars.  He searched the apartment to make sure no
one else was there, and then he held the firearm to her back and forced her
upstairs to the bedroom.  Guadarrama understood that the man wanted her to take
her clothes off, and she did.  Then he asked her if she had a condom; she told
him no, and he said that he had one.  He laid down on the bed and told her to
get on top of him, and she cooperated.  The man raped her and forced her to act
like his wife or partner.  He told her not to look at him.  After he raped her,
he told her to get her son and go into the bathroom for fifteen minutes to give
him time to leave, and not to tell the police or her husband what happened.  She
heard him turn on the television and wander around the apartment for about five
minutes before she heard him leave.  Guadarrama called her husband, and he came
home and called the police.  In court, Guadarrama indentified Jabari as the man
who raped her, and she identified the weapon that he had in his possession at
the time of his arrest as the firearm he used in the rape.  

Officer P. Moreno testified that he
was an officer in the sex crimes unit of the homicide division of the Houston
Police Department and had been for about sixteen years.  He testified that
stranger-on-stranger rape, as alleged in this case, often happens in a serial
pattern with similarities among the incidents of rape.  Here, Officer Moreno
interviewed Beatrice Conde, Maria Pena, and Gemina Guadarrama about their rapes,
and observed commonalities among the cases.  All of the rapes took place in
predominantly Hispanic apartment complexes, the victims were all home alone or
with small children during the day, and each described her attacker as a black
man wearing glasses and using a small chrome-plated firearm.  Based on this
information, Officer Moreno developed a profile of the rapist, canvassed the
neighborhood, and held a news conference to get a description of the attacker out
to the public.  

Officer R. King testified that he was
on patrol duty on the afternoon of January 26, 2007, when he was called to the
Glenmont Colony apartments in southwest Houston, a few blocks from Guadarrama’s
apartment, because a maintenance man had seen a man that matched the
description of a composite drawing of the rapist released to the public.  The
maintenance man directed Officer King and another officer to an apartment. 
Jabari was inside the apartment, and he cooperated with the officers, gave them
his identification and consent to search his vehicle, and warned them that there
was a weapon inside the vehicle.  He wore a baseball cap and glasses, and had a
condom in his pocket.  The officers arrested Jabari.  While Jabari was in custody,
the police created a lineup.  They showed the lineup to Gemina Gudarrama, and
she identified Jabari as her attacker.  Police videotaped the same lineup and
showed it to Maria Pena.  Pena also identified Jabari.  Conde did not view the
lineup because police could not locate her.

Jabari testified on his own behalf
that he did not commit these rapes.  He testified that he was at work, at the Salam Community Center, which he owned, on the days of Conde and Pena’s rapes, and that he
was taking his wife to therapy for an injury on the day of Guadarrama’s rape. 
He testified that he spoke a little Spanish, but had never taken any Spanish
classes.  He conceded that he was convicted in California of two cases of
forcible rape, and in California and Texas for failure to register as a sex
offender.  No one else testified on Jabari’s behalf.

Extraneous Offenses

          Jabari contends that the
trial court erred in admitting the evidence of the two unadjudicted extraneous
offenses because they are not sufficiently similar to the complaining witness’s
description to establish a signature or modus operandi, and the probative value
of the evidence is substantially outweighed by its potential for prejudice. 
Jabari further contends that the trial court improperly admitted evidence that his
two prior forcible rape convictions in California involved Hispanic women.  

We review a trial court’s
admission of extraneous evidence under an abuse of discretion standard.  Page,
137 S.W.3d at 78; Lane, 933 S.W.2d at 519.  As long as the trial court’s
ruling is within the “zone of reasonable disagreement,” there is no abuse of
discretion, and we uphold the ruling.  Thomas, 126 S.W.3d at 143.

          Texas
Rule of Evidence 404(b) prohibits admission of extraneous offenses to prove a
person’s character or to show that the person acted in conformity with that
character. See Tex. R. Evid.
404(b). Extraneous offenses may, however, be admissible
to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Montgomery v. State, 810 S.W.2d 372, 387–88 (Tex. Crim. App. 1990).  An extraneous offense may be admissible
to prove identity only if the identity
of the perpetrator is at issue in the case. Page v. State, 213 S.W.3d
332, 336 (Tex. Crim. App. 2006); Lane v. State, 933 S.W.2d 504, 519
(Tex. Crim. App. 1996). A defendant can raise the issue of identity by cross-examination,
by impeaching the identifying witness on a material detail of identification.  Page
v. State, 137 S.W.3d 75, 78 (Tex. Crim. App. 2004); Siqueiros v. State,
685 S.W.2d 68, 71 (Tex. Crim. App. 1985).  Additionally, a defendant may raise
the issue of identity by presenting an alibi. Moore v.
State, 700 S.W.2d 193, 201 (Tex. Crim. App. 1985); Hughes v. State,
962 S.W.2d 89, 92 (Tex.App.—Houston [1st Dist.] 1999, pet. ref’d).  Here,
Jabari offered both an alibi defense and impeached Conde’s identification of
him as the perpetrator, placing identity at issue in this case.

          Raising the
issue of identity does not automatically render evidence of an extraneous
offense admissible.  Page, 213 S.W.3d at 336.  Rather, such evidence is
admissible under both Rules 403 and 404(b) if it is relevant, aside from its
tendency to show action in conformity with character, and its probative value
is not substantially outweighed by any unfair prejudice.  Id.; Johnson
v. State, 145 S.W.3d 215, 220 (Tex. Crim. App. 2004).  

Where the State uses an
extraneous offense to prove identity by comparing common characteristics of the
crime, the extraneous offense must be so similar to the charged offense that it
illustrates the defendant’s “distinctive and idiosyncratic manner of committing
criminal acts.”  Page, 213 S.W.3d at 336 (quoting Martin v. State,
173 S.W.3d 463, 468 (Tex. Crim. App. 2005)).  Such evidence must demonstrate a
much higher degree of similarity to the charged offense than extraneous
offenses admitted for other purposes, such as intent.  Bishop
v. State, 869 S.W.2d 342, 346 (Tex. Crim. App. 1993).  Without a high degree
of similarity, the probative value of the extraneous offense evidence is outweighed by its prejudicial effect.  Id.  In reviewing a trial court’s decision to admit such evidence, appellate courts
should take into account the specific characteristics of the offenses and the
time interval between them.  Thomas v. State, 126 S.W.3d 138, 144 (Tex.
App.—Houston [1st Dist.] 2003, pet. ref’d).  Sufficient similarity may be shown
by proximity in time and place or by a common mode of committing the
offenses. Lane, 933 S.W.2d at 519 (citing Ransom v. State, 503
S.W.2d 810, 813 (Tex. Crim. App. 1974)) (emphasis in original).

          Jabari contends
on appeal that the extraneous offenses are not similar enough to the charged
offense to constitute proper identity evidence.  We disagree.  While Jabari
points out differences between Conde’s rape and Pena’s and Guadarrama’s rapes,
sufficient similarities exist between the offenses to support the trial court’s
decision to admit them.  In all three cases:  the victims lived in apartment
complexes predominantly occupied by Hispanics; the rapes occurred during the
day and the victim was the only adult at home; the victims spoke little English;
the assailant, a black male who wore glasses, spoke to the victims in English
and broken Spanish; the assailant approached the victims using some kind of
ruse, like asking for a sandwich or a piece of paper and a pencil or if someone
lived there; the assailant used the same sort of weapon in each case—a small
chrome-plated firearm; the assailant used a condom, left the scene without
removing it, and told the victims not to tell anyone about what happened and to
stay in one place until he left.  Two of the offenses occurred within a week of
each other at apartment complexes near Jabari’s residence at the time, and the
third occurred eleven months later, blocks from the apartment complex where
Jabari was arrested in southwest Houston.  See Thomas, 126 S.W.3d at 146
(holding that eleven months between offenses is not so remote in time as to be
inadmissible).  Each of the victims identified Jabari as her attacker in court.
We hold that the facts and circumstances of the two extraneous offenses are
sufficiently similar to the charged offense that the trial court’s decision to admit
them to prove identity falls within the zone of reasonable disagreement.

          Under Rule 403,
we evaluate relevant evidence to determine if its probative value is
substantially outweighed by the potential for unfair prejudicial effect.  See
Tex. R. Evid. 403.  We consider
several factors:

(1)     
How compellingly
evidence of the extraneous misconduct serves to make more or less probable a
fact of consequence,

(2)     
The potential for the
“other crime, wrong, or act” has to impress the jury in some irrational but
indelible way,

(3)     
How much trial time
the proponent needs to develop the evidence of the extraneous offense, and

(4)     
The proponent’s need
for the extraneous offense

 

Lane, 933 S.W.2d at 520.  We
uphold the trial court’s ruling if it is within the zone of reasonable
disagreement.  Id.  

Given the similarity of
the assailant’s modus operandi and the relative proximity of the rapes—two to
each other and all three as to Jabari’s current residence—and the witnesses’
in-court identification of Jabari, the extraneous offense evidence is
compelling as to the issue of identity.  Conde initially did not identify her
attacker at trial, and she could not be found before trial to identify Jabari
in a photo lineup.  The defense used these facts to impeach Conde on the issue
of identity, thus providing the State with a reason to develop extraneous
offense evidence.  Conde’s description of her attacker and the modus operandi
of the crime match the other two offenses, making her identification of Jabari
more probable.

The admission of the similar
extraneous offenses carried a risk of irrationally impressing the jury of
Jabari’s character conformity, which the law seeks to avoid.  The impermissible
inference of character conformity can be minimized, however, with a limiting
instruction.  Lane, 933 S.W.2d at 520.  Here, the trial court instructed
the jurors to limit their consideration of the extraneous offense evidence.  Moreover,
it was the similar nature of the crimes that was the focus of the testimony.  Pena
and Guadarrama were the only two witnesses called to testify at trial about
extraneous offenses. Their testimony did not take up a significant portion of the
trial, and the amount of time used for their testimony was reasonable and not
excessive.

Finally, the State’s need
for the evidence was strong.  Conde initially struggled during her testimony to
identify Jabari as her attacker, and she was impeached by the defense.  Although
DNA evidence on the sandwich from Conde’s apartment matched Jabari’s, such a
fact establishes that Jabari was at the apartment, but does not directly
identify him as her attacker.  Thus, the extraneous offenses were significant to
the State’s case.

The trial court was
within the zone of reasonable disagreement when it ruled that the probative
value of the evidence of the two unadjudicated extraneous offenses was not substantially
outweighed by the danger of unfair prejudice.  Thus, we hold that the trial court
did not abuse its discretion in admitting the evidence under Rule 403.

          Jabari further contends
that the State improperly introduced an underlying fact of his prior convictions
for forcible rape in California.  On direct examination, Jabari’s attorney adduced
evidence of Jabari’s two forcible rape convictions in California and his two convictions
for failure to register as a sex offender in California and in Texas.  On cross-examination, the State brought out the detail that both California rape
victims were Hispanic.  Defense counsel objected, and the trial court overruled
the objection.

          Under Texas
Rule of Evidence 609, the fact of a prior conviction is generally admissible to
impeach a witness if that crime was a felony or involved moral turpitude.  See
Tex. R. Evid. 609.  However, the
details of the conviction are generally inadmissible for the purpose of
impeachment.  Mays v. State, 726 S.W.2d 933, 953 (Tex. Crim. App. 1986);
Arebalo v. State, 143 S.W.3d 402, 407 (Tex. App.—Austin 2004, pet.
ref’d).  

In its brief, the State
concedes that the details of the California offense were not admissible for the
purpose of impeachment under Rule 609, but argues that they were admissible
under Rule 404(b) for the purpose of proving identity because the convictions
were, in fact, extraneous offenses, and their details tend to prove identity.  We
disagree.  Under the Rule 404(b) analysis, the State adduced no evidence that the
details of the California rapes were so similar to the rape in this case as to
indicate a signature or modus operandi.  The only similarity proffered
by the State between the instant offense and the California rapes is that the
victims were Hispanic.  The convictions occurred 1989 in another state, and
Jabari encountered the victims in a public place and invited them back to his
residence, where he raped them.  Despite the decade and physical distance
between the California rapes and the rape in the instant case, the rapes might
have been admissible if Jabari had used similar tactics on the California victims.  See Lane, 933 S.W.2d at 519 (holding that sufficient similarity
between the mode of committing the offenses made the offenses admissible, even
though they occurred a decade apart and in different states).  Here, the State
provided no facts that indicated that Jabari’s mode of commission was similar
in these two cases to the present case.  Accordingly, we hold that the facts the
State presented as to the two California convictions are not similar enough to
constitute a signature under Rule 404(b), and thus it was error to admit the
detail to show conformity of character.  See Avila v. State, 18 S.W.3d
736, 741 (Tex. App.—San Antonio 2000, no pet.).

Consequently, we must determine
whether the trial court’s error was harmful.  Error in the admission of
evidence is non-constitutional error subject to a harm analysis under Rule
44.2(b) of the Texas Rules of Appellate Procedure.  Tex. R. App. P. 44.2(b); see Johnson v. State, 967
S.W.2d 410, 417 (Tex. Crim. App. 1998).  Under that analysis, we disregard any
non-constitutional error that does not affect substantial rights.  Tex. R. App. P. 44.2(b).  A substantial
right is affected when the error had a substantial and injurious effect or
influence in determining the jury’s verdict.  Morales v. State, 32
S.W.3d 862, 867 (Tex. Crim. App. 2000) (quoting King v. State, 953
S.W.2d 266, 271 (Tex. Crim. App. 1997)).  Appellate courts should not overturn
a criminal conviction for non-constitutional error if the court, after
examining the record as a whole, has fair assurance that the error did not
influence the jury, or had but slight effect.  See Johnson, 967 S.W.2d
at 417.  The improper admission of evidence does not constitute reversible
error if other properly admitted testimony proves the same facts.  See Brooks v. State, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999).

Here, the trial court
properly admitted the convictions themselves under Rule 609.  The improperly
admitted evidence is the detail that the victims of Jabari’s prior rapes in California were Hispanic.  The other evidence adduced at trial, however, already had
indicated that Jabari targeted Hispanic women, which is presumably what the
State sought to prove in admitting that fact about the California victims.  The
evidence that the prior rapes involved Hispanic women was not important to the
State’s case, as the State had built a strong case with the testimony of Conde,
Pena, and Gudarrama that Jabari had raped them.  Additionally, the State presented
DNA evidence placing Jabari at Conde’s apartment, where the rape occurred. 
Given the other evidence, we hold that the error did not have a substantial or
injurious effect in determining the jury’s verdict, and thus did not affect
Jabari’s substantial rights so as to warrant reversal.  Ample other evidence
existed on which the jury could have found Jabari guilty.  

Failure to Inquire into Witness’s
Spanish Outburst

          Jabari contends that he was
denied his due process right to a fair and impartial jury and his Sixth
Amendment right to confront witnesses against him when Conde had an emotional
outburst during her testimony in the presence of the jury in Spanish, that was
not translated or recorded.  First, Jabari contends that the trial court erred
in failing to conduct an inquiry into what part of the outburst the jury
overheard to determine whether an adequate curative instruction was possible. 
Second, Jabari contends that he was denied his Sixth Amendment right to
confront witnesses against him because he was unable to cross-examine Conde
about the remarks.  Third, Jabari argues that the harm was exacerbated when the
prosecution referred to the outburst in closing arguments.

          Jabari’s complaint that the
trial court failed to conduct an inquiry into what was said is not preserved
for review.  To preserve a complaint for appellate review, a party must present
the trial court with a timely request, objection, or motion stating specific grounds
for ruling sought.  Tex. R. App. P. 33.1(a). 
After Conde’s outburst, in open court, Jabari’s attorney moved for a mistrial
based on alleged prejudice to the jury from Conde’s untranslated and unrecorded
emotional statements, which did not constitute testimony.  The trial court
denied the motion for mistrial.  When the jury re-entered the courtroom, the
trial court gave a limiting instruction to the jury, telling it to disregard
any comments that were not in direct response to a question that was immediately
asked.

Jabari complains that the trial court
did not conduct an inquiry into whether the jurors heard or understood the
outburst.  He further contends that it was error for the trial court to fail to
settle the record as to the off-the-record Spanish outburst, so that Jabari
could know what was said and determine whether to cross-examine Conde on her
outburst.  Jabari, however, failed to present his request to the trial court or
obtain a ruling.  See Tex. R.
App. P. 33.1(a); Garcia v. State, 2004 WL 2871750, *14 (Tex.
App.—San Antonio 2004, ­­­pet. ref’d) (holding that defendant waived any error
in failure to translate defendant’s wife’s out-of-court Spanish statement,
overheard by jurors, because defendant did not request an official
translation).  For inflammatory conduct by a witness to be grounds for error,
the appellant has the burden to ensure that the activity of which he complains
is made a part of the complete record so that any error is preserved for
appeal.  Baker v. State, 797 S.W.2d 406, 408 (Tex. App.—Fort Worth 1990,
­­­pet. ref’d) (holding that any error in failing to grant mistrial based on
“inflammatory” conduct was waived because appellant failed to meet burden of
ensuring that inflammatory conduct was described in the record).  Since Jabari
never requested that the court settle the record or translate the Spanish
outburst and determine its inflammatory nature, he failed to meet his burden. 
We hold that any error is waived.

Jabari’s failure to secure a
translation of Conde’s Spanish outburst for the record likewise waives any
error that may have arisen from his inability to confront the witness.  Jabari’s
objection to the Spanish outburst never mentioned the Confrontation Clause of
the Sixth Amendment, nor did the context of the objection “serve to amply flesh
out its meaning,” as Jabari suggests in his brief.  Finally, Jabari
cross-examined the witness after the incident and was never precluded from
inquiring about the outburst.  Thus, any error on this point was similarly
waived.

Finally, Jabari contends that the
prosecution “made dramatic use of Ms. Conde’s hysterical outburst” by arguing
in summation that the outburst was prompted by her recognition of Jabari in the
courtroom.[2] 
In support of his argument, he relies on Stahl v. State, 749 S.W.2d 826
(Tex. Crim. App. 1988).  In Stahl, the trial court warned the mother of
the victim before her testimony, out of the presence of the jury, that she
could not show any emotion when asked to identify her son from a photo taken of
him in the morgue.  Id. at 828.  The court held that the prosecutor in
Stahl engaged in misconduct by intending an outburst or being indifferent to
the risk of one, and by exacerbating the impact on the jury by referencing the
mother’s grief in his closing argument.  Id. at 830.  Stahl
discusses three factors to consider in prosecutorial misconduct: (1) whether
the defendant objected, (2) whether the prosecutor violated an express court
order, and (3) whether prosecutorial conduct was blatant.  Id. at 831. 
Here, the prosecution referred to Conde’s outburst in her closing arguments. 
But unlike in Stahl, defense counsel did not object, and the
prosecutor’s statement did not violate an express court order.  Stahl, thus,
is distinguishable, and Jabari waived any error in the closing argument by
failing to object.

We hold that Jabari did not properly
preserve his complaints on appeal about Conde’s outburst.  

Withholding Exculpatory Evidence

          Jabari contends that he was
denied due process rights because the State or its agents withheld material and
exculpatory evidence in violation of its duty under Brady v. Maryland,
373 U.S. 83, 83 S. Ct. 1194 (1963).  At trial, Conde testified that she made
Jabari a sandwich and poured him a glass of juice.  Jabari took a bite from the
sandwich, and she also thought he took a sip from the glass of juice.  Officer
Salazar testified that he did not recall seeing a glass on the table with the
sandwich.  Jabari asserts that Officer Salazar is “disingenuous” in his
testimony that he did not recall a juice glass, and that this court must assume
that officers collected the glass and tested it for fingerprints.  According to
Jabari, the fact that no fingerprint evidence from the juice glass was
presented at trial “compels the conclusion that this evidence was exculpatory.”

          To establish a Brady violation,
a defendant must satisfy three requirements: (1) the State suppressed evidence;
(2) the suppressed evidence is favorable to the defendant; and (3) the
suppressed evidence is material.  Harm v. State, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006).  The Brady obligation to disclose evidence generally does not
apply to evidence that the State does not possess or does not know to exist.  See
Thompson v. State, 612 S.W.2d 925, 928 (Tex. Crim. App. 1981).  Furthermore,
the State’s duty is limited to evidence that has an apparent exculpatory value
before it is destroyed, and the appellant must show bad faith on the part of
the police.  Herbert v. State, 836 S.W.2d 252, 253–54 (Tex. App.—Houston
[1st Dist.] 1992, pet. ref’d).  Jabari presents no evidence that the State
actually possessed and withheld the glass, that the glass constituted
exculpatory evidence favorable to the defendant, or that any bad faith on the
part of the police exists.  See Menefee v. State, 211 S.W.3d 893, 903
(Tex. App.—Texarkana 2006, pet. ref’d) (holding that appellant did not have a
valid claim that the State failed to develop evidence that might have been
exculpatory because appellant did not show any evidence which was known to the
State and not the appellant and was favorable to the appellant); Pachecano
v. State, 881 S.W.2d 537, 543 (Tex. App.—Fort Worth 1994, no pet.) (holding
that appellant made no showing that the evidence in question ever existed, and
their existence was denied by the custodian of the evidence, so they could not
have been destroyed or preserved).  

We hold that Jabari failed to meet
his burden to show that a Brady violation occurred.  

DNA Evidence and Factual Sufficiency

          Jabari contends that the
DNA evidence did not cure the harm caused by the admission of the unadjudicated
extraneous offenses and his convictions for rape in California, and that the
DNA evidence alone is not factually sufficient to sustain his conviction. 
Jabari contends that police officer misconduct rendered the DNA evidence
unreliable, and he accuses the officers of manufacturing evidence against him. 
As we have held that the trial court did not err in admitting the extraneous
offenses, and that the error in admitting extra detail about his two prior
convictions was harmless, Jabari’s “harm” argument is irrelevant.  Construing
this issue as a challenge to the factual sufficiency of the evidence, we
conduct a factual sufficiency analysis based on the evidence admitted.

In a factual sufficiency review, we
consider all the evidence in a neutral light to determine whether the jury was
rationally justified in finding guilt beyond a reasonable doubt.  Watson v.
State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006).  We set the verdict
aside only if (1) the evidence is so weak that the verdict is clearly wrong and
manifestly unjust or (2) the verdict is against the great weight and
preponderance of the evidence.  Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).  Under the first prong of Johnson, we cannot conclude that a
verdict is “clearly wrong” or “manifestly unjust” simply because, on the
quantum of evidence admitted, we would have voted to acquit had we been on the
jury.  Watson, 204 S.W.3d at 417.  Under the second prong of Johnson,
we cannot declare that a conflict in the evidence justifies a new trial simply
because we disagree with the jury’s resolution of that conflict.  Id.  Before finding that evidence is factually insufficient to support a verdict
under the second prong of Johnson, we must be able to say, with some
objective basis in the record, that the great weight and preponderance of the
evidence contradicts the jury’s verdict.  Id.  We must also discuss the
evidence that, according to the appellant, most undermines the jury’s verdict. 
See Sims v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

Jabari does not specifically point
out any evidence that undermines the jury’s verdict.  Instead, Jabari claims
that Officer Moreno “engineered” and “manufactured” the prosecution against him. 
He asserts, without support in the record, that the DNA evidence from the
sandwich was mishandled.  He also argues that the DNA evidence was manufactured
because, as a Muslim, he would not have taken a bite of a ham sandwich.  These
unsupported assertions do not constitute evidence undermining the verdict. 
Additionally, Jabari argues that the lack of fingerprint evidence from the
glass that was not taken into evidence from Conde’s apartment, and the fact
that Conde saw Jabari only for a few minutes support a finding that the
evidence was factually insufficient.  The properly admitted testimony and
identifications of Jabari by Beatrice Conde, Maria Pena, and Gemina Guadarrama,
and the DNA evidence from the sandwich from Conde’s apartment, when viewed in a
neutral light, are factually sufficient to support the jury’s verdict.  The
only contrary evidence was Jabari’s own testimony in which he denied that he
committed the rape, and we leave conflicts in the evidence to the resolution of
the jury.  Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). 
After reviewing the properly admitted evidence at trial, including the
testimony of the complaining witness identifying Jabari and the DNA evidence,
we hold that the evidence is not so weak as to be manifestly unjust, nor is the
great weight and preponderance of the evidence contrary to the jury’s verdict.

Motion for New Trial

Jabari contends that the trial court
abused its discretion in not conducting a hearing on his motion for new trial. 
On November 15, 2007, Jabari, through his court-appointed attorney, timely moved
for new trial.  In his motion for new trial, Jabari argues that the State
withheld evidence in violation of Brady v. Maryland, that Officer Moreno
engineered the investigation against him, and that Jabari’s trial counsel was
ineffective for reasons including refusing to use “evidence” of Moreno’s bias at trial.  The motion for new trial was set for a hearing on December 18,
2007.  When the parties appeared in court for the hearing, they learned that
Jabari had filed a pro se motion to recuse the trial judge.  The judge
suspended his decision on the motion for new trial pending the decision of
another trial court on the motion to recuse.  On February 12, 2008, Judge Olen
Underwood denied the motion to recuse.  At this point, more than 75 days had
elapsed since the motion for new trial was filed, and no hearing had been
conducted.  Thus, the motion for new trial was deemed overruled by operation of
law under Texas Rule of Appellate Procedure 21.7.  See Tex. R. App. P. 21.7.  Jabari now requests
that we remand this case so that the trial court may conduct a hearing on the
motion for new trial.

When reviewing on appeal a trial
court’s denial of a motion for new trial, the proper standard of review is
abuse of discretion.  Wallace v. State, 106 S.W.3d 103, 108 (Tex. Crim. App. 2003); McIntire v. State, 698 S.W.2d 652, 660 (Tex. Crim. App. 1985). 
We review the trial court’s denial of a hearing on a motion for new trial by
examining “whether the court acted without reference to any guiding rule and
principles.”  Bruno v. State, 916 S.W.2d 4, 6 (Tex. App.—Houston [1st Dist.] 1995, pet. ref’d).  The right to a hearing on a motion for new trial
is not absolute.  Reyes v. State, 849 S.W.2d 812, 815 (Tex. Crim. App.
1993); Bruno, 916 S.W.2d at 8.  A defendant has a right to such a hearing
when the motion raises matters that cannot be determined from the record.  Reyes,
849 S.W.2d at 815; Bruno, 916 S.W.2d at 8.  A trial court abuses its
discretion if it fails to hold a hearing when the defendant has a right to a
hearing.  Reyes, 849 S.W.2d at 815; Bruno, 916 S.W.2d at 8.

Jabari raises claims, like
ineffective assistance of counsel and police misconduct, that are not
determinable on this record.  But to proceed to a hearing, the motion must meet
all of the prerequisites for a prima facie showing of new trial grounds.  See
Green v. State, __ S.W.3d __, 2007 WL 2332530, *1–2 (Tex. App.—Houston [1st Dist.] 2007, pet. ref’d).  Texas Rule of Appellate Procedure 21 requires that
a motion be: (1) timely filed, (2) properly presented, and (3) adequately
verified, or that a sworn affidavit (by an inmate) be provided in lieu of
verification.[3] 
See Tex. R. App. P. 21.4,
21.6; Green, ­­__ S.W.3d __, 2007 WL 2332530 at *2.  The affidavit must
show specific facts to support the grounds alleged as a basis for new trial.  Reyes,
849 S.W.2d at 816.  Affidavits that are conclusory in nature and not supported
by facts are insufficient to put the trial court on notice that grounds for
reasonable relief exist.  Jordan v. State, 883 S.W.2d 664, 665 (Tex. Crim. App. 1993).

Jabari’s motion for new trial
attaches his handwritten statement entitled “Defendant’s Official Statement in
Support of Motion to Set Aside Conviction and Grant a New Trial.”  In this
document, Jabari should have sworn to specific facts to support a motion for
new trial.  See Torres v. State, 4 S.W.3d 295, 296–97 (Tex. App.—Houston
[1st Dist.] 1999, no pet.) (holding that appellant’s affidavit was sufficient
because appellant claimed, among other things, that his lawyer (1) persuaded
him to plead guilty without an agreed sentencing recommendation, (2) told him
he would probably get probation or boot camp, and (3) told him he would receive
immunity from prosecution for any unadjudicated extraneous offenses.)  Instead,
Jabari’s statement is general rhetoric, asking the trial court to invoke its
sense of “fair trial” and “law and order.”  He does not include any facts to
support the allegations of ineffective assistance and police misconduct in his
motion for new trial.  We hold that Jabari’s affidavit in support of his motion
for new trial is insufficient to warrant a hearing because it is conclusory and
without any factual support.  See Jordan, 883 S.W.2d at 665.  Thus, the
trial court did not abuse its discretion in allowing the motion to be overruled
by operation of law.

Conclusion

We hold that the trial court did not
abuse its discretion in admitting the evidence of the extraneous unadjudicated offenses
to prove identity, and Jabari did not properly preserve for appellate review any
error arising from the complainant’s unrecorded Spanish outburst on the witness
stand.  We further hold that Jabari failed to adduce any facts showing that his
complaint that the State withheld exculpatory evidence and thus violated its
duty under Brady v. Maryland has merit.  Finally, we hold that the
evidence is factually sufficient to support the verdict, and the trial court did
not err in allowing Jabari’s motion for new trial to be overruled by operation
of law.  Accordingly, we affirm the judgment of the trial court.

 

 

                                                          Jane Bland

                                                          Justice

 

Panel consists of Judges Jennings,
Hanks, and Bland.

Publish.  See Tex. R. App. P. 47.2(b).









[1]
Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963).





[2] In closing, the prosecutor argued:

“And did you go home Monday
night like I did and hear the terror in Beatrice Conde’s voice over and over in
your mind?  When she sat in that chair, very comfortably and looked around the
room and didn’t think her rapist was here.  Because somehow, and you can think
it was an accident or you can think it was on purpose, I kind of have my doubts
that it was an accident, he was leaned back in his chair just so that his face
was concealed by his attorney at the time that I asked her to identify him. 
And all she could see was just another suit sitting in that chair.  And then,
in that moment, that brief fleeting moment where somebody moved slightly and
she caught sight of him; oh, my God, she saw him.  And that little moment of
comfort that he wasn’t here and all of a sudden seeing him again for the first
time, a year later, brought it all back to her.  And did the way she reacted
make you wonder, what he did to make her scream that way?”





[3] Texas Civil Practice and Remedies Code Section
132.001 allows an inmate in the Texas Department of Criminal Justice or in a
county jail to make an unsworn declaration in lieu of a written, sworn
declaration, as long as it meets the requirements in Section 132.002, which
requires that it be in writing and subscribed by the person making the
declaration as true under the penalty of perjury, and it be substantially in
the form as set out by Section 132.003.  Tex.
Civ. Prac. & Rem. Code Ann. §§ 132.001–.003 (Vernon 2005); see
Owens v. State, 763 S.W.2d 489, 490 (Tex. App.—Dallas 1988, pet. ref’d);
Green v. State, __ S.W.3d __, 2007 WL 2332530, *2 (Tex. App.—Houston [1st Dist.] 2007, pet. ref’d).